## IN THE SUPREME COURT OF MISSISSIPPI

## NO. 96-DP-00867-SCT

*LARRY MATTHEW PUCKETT*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/07/96 |
| TRIAL JUDGE: | HON. RICHARD WAYNE McKENZIE |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | MICHAEL ADELMAN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LESLIE S. LEE |
| DISTRICT ATTORNEY: | E. LINDSEY CARTER |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY (DIRECT APPEAL) |
| DISPOSITION: | REMANDED - 3/25/1999 |
| MOTION FOR REHEARING FILED: | 3/31/99 |
| MANDATE ISSUED: | |

### EN BANC.

### SMITH, JUSTICE, FOR THE COURT:

¶1. Larry Matthew Puckett was indicted during the January 1996 term of the Circuit Court of Forrest County, Mississippi, for the capital murder of Rhonda Hatten Griffis on October 14, 1995, while engaged in the commission of the crime of sexual battery in violation of Miss. Code Ann. § 97-3-19(2)(e)(1994 & Supp. 1998). Venue was transferred from the Forrest County Circuit Court to the Circuit Court for the First Judicial District of Harrison County, Mississippi. A jury was empaneled on July 29-30, 1996, and on August 2, 1996, the jury returned a unanimous verdict finding Puckett guilty of capital murder. Thereafter, the jury heard evidence and arguments in aggravation and mitigation of the sentence to be imposed. On August 5, 1996, the jury returned a verdict imposing the death sentence. The trial judge sentenced Puckett to death by lethal injection and set an execution date of September 13, 1996. Puckett's Motion for Judgment Notwithstanding the Verdict or in the Alternative Motion for New Trial, as well as his supplemental Motion for Judgment Notwithstanding the Verdict or in the Alternative Motion for New Trial, were denied, and his execution stayed pending appeal on August 9, 1996.

¶2. This Court has considered all issues raised by Puckett and with the lone exception of Issue III, they are all without merit. Because the trial court did not conduct a proper hearing, we remand for the limited purpose of conducting a hearing as mandated in ***Batson v. Kentucky***, 476 U.S. 79 (1986), and our

precedent case ***Hatten v. State***, 628 So. 2d 294, 298 (Miss. 1993).

**STATEMENT OF FACTS**

¶3. On October 14, 1995, shortly before 5:00 p.m., Mrs. Rhonda Hatten Griffis, age 28, was found lying in a large pool of blood next to the couch in the living room of her home on 198 Sunrise Road, Petal, Mississippi. Mrs. Griffis was found wearing a t-shirt, and the only clothing on the lower part of her body was around her left foot. She had several gashes on the back of her head. There were other injuries to Mrs. Griffis' head, back, and chest, including a deep laceration and three to four hesitation marks to the neck. She was also bleeding from her vagina. She had several defensive wounds on her hands, arms, and elbows. Mrs. Griffis died as a result of the injuries; the cause of death was cranial cerebral trauma, secondary to blunt force trauma. A wooden stick or club covered with blood was recovered outside the residence.

¶4. Rhonda's mother, Nancy Hatten, lived next door, roughly 150-175 feet from the Griffis' trailer. On the day of the murder, Mrs. Hatten helped Rhonda's boys, Justin, age 7, and Jeffrey, age 5, put up Halloween decorations in the yard. Rhonda was not feeling well that day, suffering from a headache and bad sinus problems. Later that afternoon, Mrs. Hatten was in her front yard when she heard a "scream and a thud" come from the Griffis' trailer. Mrs. Hatten then ran home and telephoned the trailer. The phone rang four or five times, but there was no answer. Mrs. Hatten hung up and dialed again, but there was still no answer. She then immediately went to the trailer.

¶5. As Mrs. Hatten neared the trailer, she saw David Griffis, Rhonda's husband, and their two boys driving up to the trailer. David had been hauling pine straw all day and was returning with his last load. A blue truck was parked in the vacant lot beside the residence. Nancy entered the trailer door at the kitchen/dining room area and called for Rhonda but there was no answer. Puckett came from the hallway into the kitchen/dining area and raised a club back and started towards Nancy. As Nancy backed away from Puckett, Jeffrey entered the house followed closely by David. Justin was still outside. Nancy then took the children, ran to her house, locked the boys in the bathroom, and called 911. This 911 call was received by the 911 system at 5:01:15 p.m. and answered by the 911 operator at 5:01:20 p.m. At 5:01:41 p.m., Nancy was placed on hold, as 911 received a call from the Griffis' trailer. Mrs. Hatten identified State's Exhibit Number 3 as the club that Puckett had in his hand in the trailer.

¶6. The Griffis family knew Puckett because he was once employed by David Griffis. While Puckett was employed by David, the employees would gather at the Griffis' house before leaving for work.

¶7. Jeffrey Griffis testified that when he entered the home, he saw Puckett with a club in his hand and holding on to Mrs. Hatten's shirt. David Griffis testified that when he entered the home, he saw Mrs. Hatten with Puckett standing in front of her with the club in his hand raised over his head. David indicated that Puckett was wearing army-type coveralls. The club had blood and a white substance on it. David asked Puckett what he was doing in his house and Puckett said he had hit a deer on the road and came to get David's help and to use the telephone. David called out for Rhonda but no one answered. However, Puckett told David that Rhonda was down at her mother's house. David asked Puckett about the blood on the club and Puckett indicated that it was blood from the deer. David then dialed 911 from a portable phone that was laying on the counter beside him. This 911 call was received by the 911 system at 5:01:27 p.m. and answered by the 911 operator at 5:01:41 p.m. This (David's) call was terminated at 5:04:42 p.m. At some point, David and Puckett struggled and David got the club from Puckett. David tried to keep Puckett in the trailer until the police arrived. However, Puckett took off running towards the door. As

Puckett was running for the door, David swung the club and hit Puckett on the shoulder. Then, as Puckett ran out the door, David threw the club at him. Dr. Michael West testified at trial that the club, State's Exhibit 3, was consistent with the wound pattern found on Puckett's back.

¶8. Once Puckett exited the trailer, David entered the living room and reached for his pistol that was usually on a gun cabinet just to the left of the living room door. However, the pistol was not there. David did not see Rhonda's body lying in the living room at this time. David then ran into the bedroom to retrieve a rifle from the bedroom closet. The bedroom door is straight ahead as you turn towards the cabinet. As David exited the bedroom and re-entered the living room, he then saw Rhonda laying on the floor. He saw that Rhonda was injured and dialed 911 again to inform the police. David's second 911 call was received by the 911 system at 5:05:01 p.m. and was answered by the 911 operator at 5:05:07 p.m. This call was terminated at 5:11:45 p.m. The time between the end of David's first 911 call and the beginning of his second 911 call was 18 seconds. Sheriff's deputies and paramedics arrived within minutes.

¶9. Before David fired Puckett, David considered him to be a decent employee and even wrote a letter of recommendation for Puckett to become an Eagle Scout. Another former employer of Puckett's, Ray Watkins, testified that shortly before Rhonda's murder, a maul handle was broken at his work site. Watkins had the maul handle for several years, between seven (7) and ten (10) years, and believed the maul handle to be State's Exhibit No. 3. Watkins also testified that he had seen the handle in Puckett's truck on several occasions.

¶10. Puckett was seen around 3:30 p.m. the afternoon of the murder at the same house from which David Griffis was collecting pine straw. Puckett's blue 4-wheel drive truck was also seen passing the Griffis' residence at approximately 4:41 p.m.

¶11. Puckett's truck was recovered the next night in a wooded area in Perry County. On October 16, 1995, Puckett was apprehended near his mother's home in Perry County. At the time of his arrest, Puckett nervously commented to his mother that "[t]his is a lot of law enforcement for somebody who just committed a burglary." A duffle bag containing various items including a pair of coveralls was recovered from Puckett at the time of his arrest.

¶12. Puckett did not deny being in the trailer at the time of the murder, but testified that he witnessed David Griffis murder his wife. He indicated that he had originally planned only to burglarize the house in order to find money to pay his truck note. He stated that the idea to burglarize the house just popped into his head at the time he went by the Griffis' house. Puckett testified that he parked his truck in a vacant lot beside the Griffis' trailer and put his coveralls on. Puckett saw Rhonda's car at the trailer, but proceeded to the door anyway and knocked. Puckett said that Rhonda let him in and they began to talk.[1] Puckett said that he saw the stick (State's Exhibit No. 3) lying on the living room floor. He stated that he and Rhonda began kissing and he then began acting out his sexual fantasy of undressing a woman while he remained fully clothed. He said that Rhonda then saw her mother approaching the trailer, grabbed her clothes and ran into the bedroom, and told Puckett to get rid of her mother. Puckett said he ran into the dining room area and had picked up the stick and decided to scare Mrs. Hatten away with the club. Puckett further stated that after Mrs. Hatten fled with the children, David accused Rhonda of sleeping with Puckett and began hitting her with the stick that David took from Puckett. After beating his wife, David struggled to keep Puckett in the trailer, but Puckett was able to escape while David was calling 911. At trial, Puckett indicated the whole incident took four or five minutes. Puckett said he hid in the woods for two days because he was afraid of

David.

¶13. Puckett indicated that State's Exhibit No. 3 was not the same maul handle which he had obtained from a former employer, Ray Watkins. He testified instead that he had destroyed that maul handle while he was working for Mark Hicks, by making a torch out of it to burn off some trash.

## STATEMENT OF ISSUES

¶14. Aggrieved by his conviction and death sentence, Puckett appeals, and raises the following issues:

**I. WHETHER THE TRIAL COURT ERRED IN REFUSING TO GRANT A MISTRIAL BECAUSE OF IMPERMISSIBLE AND PREJUDICIAL COMMENTS BY VENIREMAN NO. 15, RICHARD A. OLSON?**

**II. WHETHER THE TRIAL COURT ERRED IN STRIKING FOR CAUSE VENIREPERSON NO. 16, WHO TESTIFIED THAT SHE COULD KEEP A FAIR AND OPEN MIND DESPITE HAVING HEARD THE COMMENTS OF VENIREMAN NO. 15, WHO WAS PROPERLY REMOVED FOR CAUSE?**

**III. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE STATE TO PEREMPTORILY STRIKE EVERY AVAILABLE BLACK JUROR IN VIOLATION OF *BATSON v. KENTUCKY* AND *POWERS v. OHIO?***

**IV. WHETHER THE TRIAL COURT ERRED IN ADMITTING INTO EVIDENCE GRUESOME AND PREJUDICIAL PHOTOGRAPHS, AS WELL AS VIDEOTAPE OF DEFENDANT?**

**V. WHETHER DR. MICHAEL WEST SHOULD HAVE BEEN ALLOWED TO TESTIFY AS AN EXPERT IN THE FIELD OF WOUND PATTERNS?**

**VI. WHETHER THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTIONS FOR MISTRIAL BASED ON PROSECUTORIAL MISCONDUCT?**

**VII. WHETHER IT WAS IMPROPER AND REVERSIBLE ERROR FOR THE DISTRICT ATTORNEY TO INQUIRE OF THE DEFENDANT AS TO HIS POST-*MIRANDA* SILENCE?**

**VIII. WHETHER THE TRIAL COURT ERRED IN ALLOWING EVIDENCE OF THE "CANEBRAKE" INCIDENT AND ADMITTING THE 911 TAPE INTO EVIDENCE?**

**IX. WHETHER THE TRIAL COURT ERRED IN REFUSING TO REDUCE THE CHARGE AGAINST THE DEFENDANT FROM CAPITAL MURDER TO SIMPLE MURDER AND FURTHER ERRED IN AMENDING OVER OBJECTION INSTRUCTION D-13 AS PROPOSED BY DEFENDANT?**

**X. WHETHER VIEWING THE EVIDENCE IN THE LIGHT MOST FAVORABLE TO THE STATE, A REASONABLE HYPOTHETICAL JUROR COULD HAVE FOUND DEFENDANT GUILTY BEYOND A REASONABLE DOUBT?**

**XI. WHETHER THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO**

**EXEMPT PHASE II FROM SEQUESTRATION?**

**XII. WHETHER THE TRIAL COURT'S LIMITING INSTRUCTION DEFINING "ESPECIALLY HEINOUS, ATROCIOUS OR CRUEL" WAS CONSTITUTIONALLY VALID?**

**XIII. WHETHER THE STATE ADDUCED EVIDENCE TO SUPPORT THE PROPOSITION THAT THE MURDER WAS COMMITTED FOR THE PURPOSE OF AVOIDING OR PREVENTING THE DETECTION AND LAWFUL ARREST OF DEFENDANT?**

**XIV. WHETHER THE TRIAL COURT ERRONEOUSLY INSTRUCTED THE JURY AS TO PENALTIES?**

**XV. WHETHER THE TRIAL COURT ERRED IN DENYING DEFENDANT'S CHALLENGES TO MISSISSIPPI'S DEATH PENALTY?**

## LEGAL ANALYSIS

**I. WHETHER THE TRIAL COURT ERRED IN REFUSING TO GRANT A MISTRIAL BECAUSE OF IMPERMISSIBLE AND PREJUDICIAL COMMENTS BY VENIREMAN NO. 15, RICHARD A. OLSON?**

¶15. Puckett maintains that the trial judge erred in not granting a mistrial after it was discovered "that Venireman No. 15, Richard A. Olson, had disregarded the Court's instructions by not only discussing the case with fellow jurors during breaks in the voir dire proceedings, but also in expressing his opinions as to Defendant's guilt, the legal tactics of Defendant's attorneys and the appropriate punishment."

¶16. Once the defense counsel raised concerns regarding Olson's comments, the trial judge immediately began the process of ascertaining what Olson was alleged to have said, where it was said, when it was said, and to whom he might have made the comments. Because the entire discussion comprised thirty-six (36) pages of the court record, it is not feasible to re-state the discussion in its entirety. However, a review of the record indicates that Olson made comments regarding the extent of the delays which were taking place at such an early stage in the proceedings, and comments regarding how he viewed the death penalty. Olson admitted to discussing both of these topics and another venire member, Juror No. 16, Janet Byrd Sinclair, confirmed that she heard Olson make comments regarding his view of the death penalty. There is nothing in the record to support defense counsel's allegations that Olson expressed his opinion as to the defendant's guilt and the appropriate punishment.

¶17. Defense counsel made the following motions for mistrial concerning Olson:

MR. ADELMAN: Your Honor, at this point, not only would I move to exclude Olson, I move for a mistrial. This man has totally disregarded the Court's instructions. He has attempted to poison the jury; his behavior is totally outside the bounds of acceptable juror behavior.

MR. ADELMAN: Yes, sir. For the record I wanted to renew our motion for mistrial. On the juror 15 Mr. Olson, I was not sure whether or not our motion for a mistrial -- we had made both a motion to excuse and also --

THE COURT: I see, when we were in chambers --

MR. ADELMAN: I feel that his talking about the issues that he talked about was **poisonous to the entire panel**. . . .

(emphasis added).

¶18. Following the extensive inquiry into the allegations concerning Olson's comments, the trial judge granted defendant's motion that Olson be excused from the venire panel, but denied defendant's motion for mistrial which was also based upon Olson's comments. In making his ruling, the trial judge went to great lengths to ascertain to whom Olson had made the alleged comments and also excused the other juror member (No. 16, Janet Byrd Sinclair) who was positively identified as hearing the alleged comments.

¶19. Puckett cites *Smith v. State*, 198 So. 2d 220 (Miss. 1967), *Schwarzauer v. State*, 339 So. 2d 980 (Miss. 1976), and *Vickery v. State*, 535 So. 2d 1371 (Miss. 1988), in support of his argument that "[b]ecause of the errant behavior of Venireman No. 15, it became impossible for the venire empaneled to render a fair and impartial verdict." Puckett asserts that, as was the case in *Vickery*, Olson's comments were so damaging that an admonishment could not cure the prejudicial effect the comments had on the jury, and thus, the motion for mistrial should have been granted so that this case could have been tried by a jury untainted by Olson's comments.

¶20. However, *Smith* is distinguishable from the case at bar in that *Smith* involved an **empaneled** juror's comments about the sanity of the defendant. *Smith*, 198 So. 2d at 223. First and foremost it's noted that in the case at bar Olson was not an empaneled juror. Olson was a member of the venire panel, who was eventually removed for cause based on the fact that he disregarded the court's instructions by making comments. Because Olson and the other venire member who overheard his comments were removed from the venire panel, the comments he made could not have influenced the jury's verdict. Secondly, Olson did not make comments about the defendant, but made comments during voir dire concerning the delays in the proceedings and his opinion of the death penalty in general.

¶21. Likewise, *Schwarzauer* involves an **empaneled** jury and as such is not properly relied upon in the case at bar. Here again, Olson and the other venire member who overheard his comments were removed from the venire panel. Therefore, the trial judge's actions ensured that Olson's comments did not influence the jury's verdict.

¶22. Puckett relies on *Vickery* for the assertion that Olson's comments were so damaging that an admonishment could not cure the prejudicial effect the comments had on the jury. Puckett's reliance on *Vickery* is misplaced because *Vickery* involved witness comments as opposed to juror comments. Additionally, *Vickery* stands for the proposition that admonishments may not be sufficient to cure the prejudicial effect of damaging comments. However, in the case at bar, assuming here that Olson's comments were prejudicial and potentially damaging, the trial judge did not rely on admonishments to cure Olson's comments. Instead, the trial judge ensured that Olson and the other venire member who overhead the comments, would not be members of the jury that was finally empaneled.

¶23. The purpose of voir dire is to select a fair and impartial jury. Because the human element is always present, the process can by no means ever be perfect. Therefore, it is the trial court's duty to ensure that although not perfect, the jury panel that is finally empaneled can render an impartial verdict. Here, the trial judge went to great lengths to ensure that any venire member who overheard Olson's comments was not included on the final jury panel. There is nothing in the record to support Puckett's defense counsels claims

that the entire venire panel was poisoned by Olson's comments. Conversely, in the abundance of caution, the trial judge excused Janet Sinclair, the one venire member who acknowledged hearing Olson's comments. This is consistent with Puckett's assertion that Olson's comments were so damaging that no admonishment could cure the prejudicial effect his comments would have on the jury. The trial judge's actions in this case went above and beyond an admonishment and ensured that the final empaneled jury could not be influenced by Olson's comments. Since the trial judge removed the individual who made the comments as well as the other individual who might possibly have been "poisoned" by Olson's comments, there is no merit to Puckett's assertion that the jury was not able to render a fair and impartial verdict. Accordingly, the trial judge did not err in denying Puckett's motion for mistrial.

## II. WHETHER THE TRIAL COURT ERRED IN STRIKING FOR CAUSE VENIREPERSON NO. 16, WHO TESTIFIED THAT SHE COULD KEEP A FAIR AND OPEN MIND DESPITE HAVING HEARD THE COMMENTS OF VENIREMAN NO. 15, WHO WAS PROPERLY REMOVED FOR CAUSE?

¶24. Puckett maintains that the trial court's dismissal of venire member No. 16, Janet Sinclair's was not supported by the record, since Sinclair indicated that she could keep a fair and open mind and render a fair verdict in the case despite overhearing the impermissible comments made by venire member No. 15, Olson. However, the State maintains that this issue is procedurally barred under Miss. Code Ann. § 13-5-79 (1972). This statute states:

> Any person, otherwise competent, who will make oath that he is impartial in the case, shall be competent as a juror in any criminal case, notwithstanding the fact that he has an impression or an opinion as to the guilt or innocence of the accused; if it appear to the satisfaction of the court that he has no bias or feeling or prejudice in the case, and no desire to reach any result in it, except that to which the evidence may conduct. **Any juror shall be excluded, however, if the court be of opinion that he cannot try the case impartially, and the exclusion shall not be assignable for error.**

(emphasis added). "On procedural grounds, once the judge exercised his discretion and determined that the jurors probably could not be impartial, then the determination may not be assigned on appeal as an error." *Coverson v. State*, 617 So. 2d 642, 646 (Miss. 1993). *See Burt v. State*, 493 So. 2d 1325, 1327 (Miss. 1986)*; Gilliard v. State*, 428 So. 2d 576, 580-81 (Miss. 1983); *Sullivan v. State*, 155 Miss. 629, 125 So. 115 (1929); *Smith v. State*, 103 Miss. 356, 60 So. 330 (1912). Once the trial judge made the determination that Sinclair should be excluded, there is a statutory bar on raising this issue on appeal.

¶25. Not only is this issue statutorily barred, it is also substantively without merit. It was noted in the record that Sinclair also disregarded the court's instructions by not reporting Olson's comments which she overheard. The trial judge also noted that Sinclair had asked to be excused for cause based on her being seven (7) months pregnant.

> On substantive grounds, statutory and case law empowered the judge with broad discretion to determine whether a prospective juror can be impartial - notwithstanding the juror's admission under oath that he or she can be impartial.

> * * * *

> In short, the important and long-established maxim has been: (1) that a defendant has no right to have *specific* prospective jurors try his or her case, and (2) that the defendant cannot complain on appeal of a particular exclusion if the end result was a jury composed of fair and impartial jurors.

*Coverson*, 617 So. 2d at 646 (citations omitted).

¶26. As in *Coverson*, the trial judge here should not be faulted for going to great lengths to ensure that the final empaneled jury was not "poisoned" by Olson's alleged inappropriate comments. Moreover, it should be noted that this issue is in direct contradiction with Issue I. In Issue I, Puckett alleges that the entire venire was "poisoned" by Olson's comments and that no admonition was sufficient to cure the prejudicial effect. However, in Issue II, Puckett maintains that even though venire member No. 16 was one of those individuals "poisoned" by Olson's comments, she still should not have been excused because she indicated that she could be fair and impartial. If Puckett truly believes that Olson's comments were so prejudicial as to warrant a mistrial and that no admonition was sufficient to cure the prejudicial effect, it doesn't logically follow that he would believe Sinclair could rise above the prejudicial effect of overhearing these alleged inappropriate comments.

¶27. Puckett also states that "if the Court was correct in removing Sinclair, then every other juror who heard Olson's comments should have been removed and Defendant's motion for a mistrial should have been granted." A review of the record reveals that the trial judge inquired of the remaining venire members whether they had overheard Olson's comments. Additionally, as a direct result of the extensive inquiry into this matter, there was some question as to whether venire member No. 4, Laurel Ouimette, also overheard Olson's comments. However, during jury selection, Puckett's defense counsel opposed her being removed from the venire. Since she could not positively be identified as the individual who overheard Olson's comments and she did not respond to the judge's inquiry as one who had overheard his comments, the trial judge ruled in the defendant's favor and did not remove her from the venire for cause. However, in light of the judge's ruling and because of its concern that she may have overheard Olson's comments, the prosecution exercised a peremptory strike against Ouimette.

¶28. Puckett further maintains that "[i]f, on the other hand, the Court was correct in denying Defendant's motion for a mistrial, there was no basis for the removal of Sinclair." Contrary to Puckett's assertion, mistrial was not warranted in the case at bar **because** the trial judge was very cautious in removing Olson and Sinclair. The trial judge was very conscientious about ensuring a fair and impartial jury and took appropriate actions to ensure that the empaneled jury was not "poisoned" by any alleged inappropriate remarks made by Olson. Accordingly, the trial court did not err in excusing Sinclair from the venire.

## III. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE STATE TO PEREMPTORILY STRIKE EVERY AVAILABLE BLACK JUROR IN VIOLATION OF *BATSON v. KENTUCKY* AND *POWERS v. OHIO?*

¶29. Puckett asserts a *Batson* violation in regards to the jury selection. Specifically, Puckett alleges that "[t]he State impermissibly used its peremptory challenges to exclude every available black juror in this case, resulting in a death sentence imposed by an all-white jury."[2] Although Puckett's argument tends to indicate that a death sentence imposed by an all-white jury is inherently suspect and automatically invokes the *Batson* analysis, this statement is not an accurate assessment of the law. What is essential in a *Batson* challenge is not necessarily the racial make-up of the final jury empaneled, but the process employed to obtain the final jury.

¶30. In ***Batson v. Kentucky***, 476 U.S. 79, 96 (1986), the United States Supreme Court articulated the elements necessary to establish a prima facie case of purposeful racial discrimination in the use of peremptory strikes utilized during jury selection.

> It is clear under ***Batson***'s express terms that a defendant raising a ***Batson*** claim must show
>
> 1. That he is a member of a "cognizable racial group";
>
> 2. That the prosecutor has exercised peremptory challenges toward the elimination of veniremen of his race, and
>
> 3. That facts and circumstances infer that the prosecutor used his peremptory challenges for the purpose of striking minorities.
>
> In sum, these components constitute the *prima facie* showing of discrimination necessary to compel the "state to come forward with a neutral explanation for challenging black jurors."

***Lockett v. State***, 517 So.2d 1346, 1349 (Miss. 1987) (footnote omitted) (citation omitted).

¶31. However, the ***Batson*** standard has since been expanded by later United States Supreme Court decisions. In ***Powers v. Ohio***, 499 U.S. 400, 402 (1991) the Court held that a criminal defendant may object to race-based exclusions of jurors effected through peremptory challenges whether or not the defendant and the excluded jurors share the same race. Thus we have noted:

> Under ***Powers***, a white defendant now has standing to object to the use of peremptory challenges on potential black jurors. In essence, the first factor required by ***Batson*** has been eliminated. To establish a prima facie case of discrimination using the ***Batson*** criteria, a white defendant must show that the prosecutor has used peremptory challenges on persons of race and that the circumstances give rise to the inference that the prosecutor used the peremptory challenges in order to strike minorities.

***Bush v. State***, 585 So. 2d 1262, 1267-68 (Miss. 1991).

¶32. Therefore, before the trial court is required to conduct a ***Batson*** hearing, it must first be shown that a prima facie case of purposeful discrimination exists. Specifically, Puckett must show that the State used peremptory challenges on black jurors in such a manner that gave rise to an inference of purposeful racial discrimination. However, it should be noted here that the State did not wait for a ***Batson*** challenge, but provided reasons for striking all jurors regardless of race or gender. Nonetheless, this voluntary action on the State's behalf should not be interpreted as eliminating Puckett's burden of establishing a prima facie case of purposeful discrimination. Upon review, this Court "must first . . . determine[] that the circumstances of the State's use of peremptory challenges against minority venirepersons created an inference of purposeful discrimination."***Thorson v. State***, 653 So. 2d 876, 898 (Miss. 1994) (Smith, J. dissenting).

¶33. If the trial court does make the determination that the defendant has properly established this inference, the burden then shifts to the prosecution to provide race-neutral reasons for each challenged peremptory strike. The defense must then provide rebuttal to the State's proffered reasons. The trial judge must then "make an on-the-record, factual determination, of the merits of the reasons cited by the State for its use of peremptory challenges against potential jurors." ***Hatten v. State***, 628 So. 2d 294, 298 (Miss. 1993).

¶34. Puckett, is a white male and his victim, Rhonda Griffis, is a white female. Out of the entire venire totaling 112, there were only eleven (11) blacks. Out of the eleven (11), six (6) were excused for cause, one (1) was excused for medical reasons and the remaining five (5) were excused based on their indication that they could not impose the death penalty under any circumstances. *Accord Witherspoon v. Illinois, 391 U.S. 510 (1968)*. Consequently, there were only five (5) blacks remaining prior to the exercise of peremptory challenges being exercised. The State used all 12 of its available peremptory challenges, four against blacks and eight against whites. This resulted in Puckett being tried by an all-white jury, six males and six females.[3]

¶35. During jury selection, the prosecution volunteered reasons for all peremptory strikes without waiting for the trial judge to determine whether the defendant had established a prima facie case of purposeful exclusion of blacks. In response to the prosecution's stated reasons, the defense counsel also stated his rebuttal. Following the defense's rebuttal, although the trial judge then ruled on each challenged juror, the trial judge did not make an on-the-record factual determination as to his ruling or independent inquiry concerning each juror as required by *Hatten v. State*, 628 So. 2d 294 (Miss. 1993).

¶36. The following portions of the jury selection process involving jurors specifically challenged by Puckett are taken from the record and are as follows:

JUROR NO. 7, GLORIA HAWTHORNE:

> MR. HELFRICH: We would strike as S1 juror No. 4, Laurel Ouimette.
>
> THE COURT: That is S1.
>
> MR. HELFRICH: Do you want reasons for it now?
>
> THE COURT: Not unless you just want to give them.
>
> MR. JONES: Go ahead and give them.
>
> MR. HELFRICH: . . . [H]er question: She would not want to be the one to enforce the death penalty.[4] S2 would be Gloria Hawthorne; she was not responsive on her questionnaire; she was one way and not responsive in open court; on her off days, she likes to sleep half the day; I don't think she would be attentive. S3.
>
> MR. ADELMAN: Before we move from S2, note for the record that Gloria Hawthorne is a black female.
>
> THE COURT: In anticipation of Batson, I did not delineate in this record, the racial or gender composition of this jury, and I don't know that any - - did any of you make that notation? I take your word for it, but I would just say - -
>
> MR. ADELMAN: I made the notation.
>
> MR. JONES: If the Court please, we think it will be a reverse back for both sides. Because the Defendant is white, it is going to be not only the black but the white; that is why we are going to give them on everyone. We ask they do the same.

* * * *

MR. ADELMAN: Our position is that the reason given is not sufficiently a race neutral reason.

MR. HELFRICH: The fact that she sleeps half a day when she is off. I am afraid she will be sleeping here. She was not responsive to questions.

MR. JONES: She was not responsive to the death penalty questions, and her questionnaire is totally different in regard to the death penalty.

* * * *

MR. ADELMAN: On her questionnaire, there is no issue about it. First of all, on her off time, she can sleep 100 percent of the time. There is no indication that it has ever interfered with her employment. She is fully employed. As far as death penalty, she stated, "I feel if you take another person's life and the Court can prove that you did it, then you should get the death penalty."

MR. JONES: If the Court please, our objection on the death penalty goes back, in open court she was totally unresponsive to our voir dire, and it is contradictory to what she says in her questionnaire, and for that reason we feel it is race - -

MR. ADELMAN: His question on the voir dire was whether or not they could put aside any feelings they had and view the evidence in light of the law.

THE COURT: The Court is of the opinion that cause has been exercised without regard to race or gender and as such would not be challenged under Batson. Who is next?

JUROR NO. 23, MARTHA BRIDGES:

HELFRICH: We would tender juror 22 Alex Smith. We would strike juror 23, Martha Bridges. In her questionnaire says, Yes, I am sick with back and knee problems, cannot sit or stand a long time; try to work two or three days a week to survive, working by myself so my business would be closed; please excuse me; she does not want to serve; she has medical problems.

THE COURT: That is S6.

ADELMAN: Your Honor, we would note for the record this is a black female, and they have struck the next tendered black as well as another female. This juror did not indicate at any time during voir dire that she would be unable to perform her duties as juror. Her opinion as to the death penalty, It depends on the circumstances. We would submit that the reason given is not race neutral in light of Batson nor is it gender neutral.

THE COURT: The Court is of the opinion that the juror was not struck for the basis of race or gender and as such will not be excused under Batson.

JUROR NO. 36, GLORIA GRAYER:

MR. HELFRICH: No. 36, we would strike Gloria Grayer. Her brother was a victim of a shooting, and she did not want to know the outcome of the case, and for that reason we would strike her.

MR. ADELMAN: For the record, we note that she is a black female. She is the third black tendered and of course the third strike of a black by the prosecution in this case. She was very open. Her opinion of the death penalty was: In some cases justified; in some cases life with no parole is best; she was an open juror. I remember her vividly saying that none of the things would affect her and she could keep an open and clear mind.[5]

THE COURT: Note for the record that she is a member of the African-American race; however, for the reasons tendered to the Court, the Court will rule she was not stricken for racially motivated reasons under Batson versus Kentucky.

JUROR NO. 43, HARVEY WESBY:

MR. HELFRICH: Juror 43, we will strike, Harvey Wesby.

THE COURT: S-10.

MR. ADELMAN: Your Honor, for the record we note that Wesby is a black male. They have now struck all four blacks on the jury panel.

THE COURT: Let me hear your reasoning on the strikes.

MR. HELFRICH: For the record, Your Honor, the Defendant - - before I get into my reasoning, the Defendant is white and the victim is white. I don't know if that has been clear in the record; I would like that in the record. On his questionnaire, where he says he is pro - - on the death penalty it's okay. He is flippant, and he was not responsive to the question in open court, and for those reasons we would strike him.[6]

MR. ADELMAN: For the record, under Batson and subsequent progeny including Powers versus Ohio it is irrelevant whether or not the Defendant is white and the victim is white. We submit that Wesby in his questionnaire is totally open; he said the death penalty was okay. I would like to know what is flippant about that. He works regularly in shipping and receiving. They have not given a race neutral reason.

MR. JONES: If the Court please, his answer on here, he says, It is okay. He did not respond in court about the death penalty. The death penalty is a race neutral reason to strike based upon that, and I am satisfied with the response.

MR. ADELMAN: Jones asked; were there any jurors who could not set aside whatever their opinion was and apply it to the facts and law.

THE COURT: The Court is of the opinion that strike was not based along racially motivated lines and as such will not be excluded under Batson.

¶37. The fact that all four blacks were stricken from the jury does not necessarily create an automatic inference of purposeful discrimination. The State used all 12 peremptory strikes; 8 were used to eliminate whites. The case at bar is similar to the circumstances in *Davis v. State*, 551 So. 2d 165 (Miss. 1989). Specifically, in *Davis*, the defendant was black, and the all-white jury was composed of four men and eight women. However, even though the State had exercised seven of its twelve peremptory challenges to

eliminate blacks, the trial court determined no pattern of discrimination was shown in view of the five challenges the State also used against whites. ***Thorson***, 653 So. 2d at 898 (citing ***Davis***, 551 So. 2d at 170) (Smith, J., dissenting). Additionally, the case at bar is distinguishable from ***Conerly v. State***, 544 So. 2d 1370, 1372 (Miss. 1989), wherein the State only used five peremptory strikes, all to eliminate black jurors. Had the State in the case at bar used only four peremptory strikes and only to eliminate black jurors, this would have been sufficient to create an inference of purposeful discrimination.

¶38. The inference of purposeful discrimination was not automatically invoked in this case. The trial judge did not make a ruling that Puckett had established this inference. The trial judge did not make on-the-record factual determinations and inquiry independently as required by ***Hatten*** regarding each peremptory challenge. We therefore remand this issue for a properly conducted ***Batson*** hearing in accordance with this opinion.

## IV. WHETHER THE TRIAL COURT ERRED IN ADMITTING INTO EVIDENCE GRUESOME AND PREJUDICIAL PHOTOGRAPHS, AS WELL AS VIDEOTAPE OF DEFENDANT?

¶39. Puckett maintains that the trial judge erred in admitting twenty-one (21) photographs into evidence as well as a videotape of the defendant. Puckett acquiesces that the trial court is granted broad discretion in ruling on the admissibility of photographs, but maintains that the photographs admitted in the case at bar did not have any probative value and as such were not admissible since the probative value was substantially outweighed by the danger of unfair prejudice. Puckett further cites ***Sudduth v. State***, 562 So. 2d 67 (Miss. 1990) in support of his argument that the pictures "present no probative value, in light of the fact that none of the following questions were at issue in this cause; corpus delicti; cause of death; location or identity of the victim."

¶40. As in the case at bar, the defendant in ***Noe v. State***, 616 So. 2d 298 (Miss. 1993) claimed that the photographs admitted into evidence "were not only gruesome and inflammatory, but served no useful evidentiary purpose because the defendant was willing to stipulate that the victim was Steven Wilson and that Wilson died as a result of a gunshot wound to the chest." ***Id.*** at 303. However, this Court held "[w] here, . . . , photographs have probative value, stipulations such as this are not an impediment to admissibility."***Id.*** Although the ***Noe*** decision deals primarily with the admissibility of autopsy photographs, it provides a very thorough analysis of the rules governing admissibility of photographs in general and is helpful to the determination of this issue.

> It is well settled in this state that the admission of photographs is a matter left to the sound discretion of the trail judge and that his discretion favoring admissibility will not be disturbed absent a clear abuse of that judicial discretion. "A review of our case law indicates that the discretion of the trial judge runs toward *almost* unlimited admissibility regardless of the gruesomeness, repetitiveness, and the extenuation of probative value." A photograph, even if gruesome, grisly, unpleasant, or even inflammatory, may still be admissible if it has probative value and its introduction into evidence serves a meaningful evidentiary purpose.

> However, while a trial judge has a great deal of discretion in the admission of photographs, this discretion is not unfettered. Indiscriminate use of autopsy photographs depicting a corpse upon which a medical technician or pathologist has used the tools of his trade to puncture, sever, dissect, and otherwise traumatize body parts is ill-advised. Autopsy photographs are admissible only if they

possess probative value.

> In *Welch v. State*, 566 So. 2d 680, 685 (Miss. 1990), we found no probative value in autopsy photographs of a dissected cadaver which demonstrated neither the circumstances surrounding death, the cruelty of the crime, the location of the wounds nor the extent of the force and violence used.
>
> This Court held, on the other hand, in *Marks v. State*, 532 So. 2d 976 (Miss. 1988), that admission of nude autopsy photographs were not an abuse of judicial discretion where the photographs clearly depicted the number, placement and multiplicity of stab wounds, the extent of the force and violence used, and where the photographs had probative value with respect to the defendant's state of mind.

*Id.* at 303-04 (citations omitted).

¶41. The following is a listing of the specific photographs (State's Exhibits) with which the defendant took issue, the reasons for the defendant's objections to each photograph, and the State's response to each. The listing will be grouped according to that depicted in Puckett's appeal brief.

## Group 1

8-1 - picture of Puckett's back with his shirt off.

8-3 - close-up of the abrasion and trauma to Puckett's right shoulder blade.

8-4 - recent scratch on the medial aspect of Puckett's right wrist.

8-5 - recent scratch on the inner aspect of Puckett's right wrist.

8-6 - medial aspect of Puckett's right forearm with two recent scratches.

8-8 - Puckett's face at the time of his arrest.

8-9 - frontal view of Puckett with his shirt off.

¶42. Puckett objected to these seven (7) photographs on the basis that the qualifying witness, Dr. Michael West, could not identify the cause of any of these alleged injuries.

¶43. The State maintains that 8-1 and 8-3 were admitted to show the injury Puckett sustained the day of the murder. This injury corroborated David Griffis' testimony that he hit Puckett with the club, State's Exhibit 3. Dr. West compared the injuries depicted in those photographs with State's Exhibit No. 3 and testified that the wounds were consistent with the type of injury one would receive from a blow with State's Exhibit No. 3. Furthermore, Puckett himself testified that State's Exhibit No. 3 was the murder weapon and admitted to being hit by David with that very same stick. Consequently, even if it had been error to allow these photographs into evidence, this could not have been prejudicial and harmful as Puckett himself confirmed the substance of the photographs.

¶44. State's Exhibits 8-4, 8-5, 8-6, and 8-8 were introduced to show the condition of the defendant's body upon arrest. This evidence was relevant and had probative value as to the issue of whether the murder was in fact committed by the defendant or whether the murder was committed by David Griffis as the defendant alleged at trial. Even though the wounds on the defendant's body were not capable of being positively

identified as being inflicted by the victim in this case, their presence could lead to the inference that Puckett received the wounds as Rhonda fought for her life. However, the defense attempted to rebut this inference by inferring the various scratch injuries could have been received while Puckett was hiding in the woods for two (2) days. It was for the jury to accept or reject either or both of the possible inferences.

¶45. State's Exhibit 8-9 originally showed Puckett without a shirt and wearing red jail jumpsuit pants. Defense counsel objected to the admission of this photograph on the grounds that because the defendant was depicted in prison clothing its prejudicial value outweighed its probative value. In response to defense counsel's objection, the trial judge ordered that the prison pants be cut out of the photograph. However, defense counsel maintains that this suggested to the jury that something incriminating had been edited out of the photograph. The State points out that 8-9 was an identifying picture to show whom Dr. West was photographing. Moreover, defense counsel fails to cite any authority for his argument.

¶46. Furthermore, a review of the case law indicates this Court will not reverse a defendant's conviction just because the jury may have observed the defendant in prison attire. *Davenport v. State*, 662 So. 2d 629, 632-33 (Miss. 1995) (holding jury's coincidental viewing of defendant in shackles while being transported outside the courthouse and downstairs in the courthouse was not reversible error); *Wiley v. State*, 582 So. 2d 1008, 1014 (Miss. 1991) (holding technical violation of jurors coincidentally viewing defendant in shackles in the courthouse hallway was no more prejudicial than defense counsel's reference to defendant being in jail); *Coleman v. State*, 378 So. 2d 640, 645 (Miss. 1979) (holding juror's viewing of defendant in prison garb in the jail complex did not constitute reversible error in absence of showing that the jury was prejudiced); *Rush v. State*, 301 So. 2d 297, 300 (Miss. 1974) (holding deputy sheriff's bringing defendant in courtroom in jury's presence while handcuffed did not result in any prejudice to his right to fair trial).

¶47. Accordingly, this Court should find no error in the trial court's admission of this group of photographs.

**Group 2**

9-2 - close-up of State's Exhibit 3 with a ruler measuring the width at the stick's end.

9-3 - picture of State's Exhibit 3 measuring the width at the mid-point of the stick.

¶48. Puckett maintains that these photographs should not have been admitted because Dr. West could not testify that the stick depicted in these photographs caused either the victim's injuries or the marks or the bruises shown in the photographs of the defendant. The prosecution pointed out these photographs were being offered for the evidentiary value of showing the size of the stick. This was in support of Dr. West's testimony indicating that the victim's wounds were consistent with State's Exhibit 3. Furthermore, Puckett himself testified that State's Exhibit No. 3 was the murder weapon, only that David Griffis was the one who used it to beat his wife to death. Puckett also admitted being hit by David with that very same stick. Consequently, even if it had been error to allow these photographs into evidence, this could not have been prejudicial and harmful as Puckett himself confirmed the substance of the photographs.

**Group 3**

10-1 - victim's right forearm showing defensive wounds.

10-2 - victim's right hand showing injuries to her fingers.

10-3 - dorsal aspect of victim's right hand showing defensive wounds.

10-4 - defensive injuries to victim's left arm.

10-7 - injuries to victim's left forearm and elbow, including a cloth pattern.

10-8 - close-up photograph of abrasion pattern injury to victim's left elbow.

¶49. During a proffer outside of the jury's presence, defense counsel made a general objection to the admission of these photographs. Puckett also fails to state a specific reason for his objection to the admission of these photographs in his appeal brief, but objects in general to the photographs as being prejudicial and of no probative value. The State maintains that these photographs were admitted to show the numerous defensive type wounds to the victim's body which were consistent with blows from State's Exhibit 3. Furthermore, Puckett himself testified that Rhonda's wounds were in fact caused by State's Exhibit No. 3, by virtue of his testimony that he witnessed David Griffis beat his wife to death with State's Exhibit No. 3. Consequently, even if it had been error to allow these photographs into evidence, this could not have been prejudicial and harmful as Puckett himself confirmed the substance of the photographs.

## Group 4

11-1 - left aspect of the victim's face and neck.

11-3 - victim's face showing nose, eyes, forehead, lips, and teeth injuries.

11-4 - injury to back of victim's skull.

11-6 - cloth pattern over injuries to victim's back.

11-7 - abrasion on the upper right chest near victim's armpit.

11-9 - left side of victim's face, showing tram line injury between victim's cheek and ear.

¶50. During a proffer outside the jury's presence, defense counsel objected to these photographs as being prejudicial and inflammatory. In his appeal brief, Puckett fails to state a specific objection other than that the photographs are prejudicial and of no probative value in this case. The State maintains that these photographs were demonstrative evidence supporting Dr. West's testimony and indicating that the injuries were consistent with State's Exhibit 3.[7]

¶51. Again, Puckett himself testified that Rhonda's wounds were in fact caused by State's Exhibit No. 3, by virtue of his testimony that he witnessed David Griffis beat his wife to death with State's Exhibit No. 3. Consequently, even if it had been error to allow these photographs into evidence, this could not have been prejudicial and harmful as Puckett himself confirmed the substance of the photographs.

## Group 5

State Exhibit 16 - aerial photograph of the trailer where the murder occurred.

¶52. Puckett contends that this photograph erroneously shows a car in the driveway next to the Griffis' residence. The State points out that Puckett's only objection is that another car was parked in the picture to describe where Puckett's truck was located at the time of the murder. The State further maintains that since

the jury was told the only significance of the car was to show where David Griffis saw the defendant's truck, Puckett fails to show and cites no authority for the proposition this was prejudicial to him.

## Group 6

State's Exhibit 13 - videotape taken the day of Puckett's arrest comparing defendant's injury to State's Exhibit 3.

¶53. The videotape was played before the jury while Dr. West narrated his observations of the scenes depicted in the videotape. At trial, Puckett objected to the admission of the videotape as being cumulative, not based on scientific principles, highly prejudicial and non-probative. The State maintains that the videotape was extremely probative as it demonstrated the blow from State's Exhibit 3 directly unto the wound pattern on Puckett's back.

¶54. The record contains thirty-seven pages of transcript wherein the trial judge conducted an in-depth review of all the photographs before allowing them into evidence. The trial judge was very careful to exclude those photographs that were cumulative and after ascertaining the probative value of each ruled that those photographs listed above were admissible. This Court should find that the trial judge did not admit the photographs indiscriminately and thus committed no error. As in *Marks*, these photographs were admissible to depict the number, placement and multiplicity of the wounds, the extent of force and violence used. *See Marks v. State*, 532 So. 2d 976, 981 (Miss. 1988). Additionally, the photographs were probative in the prosecution's case to counter the defendant's story that the husband inflicted the wounds. Because of the defendant's accusations against the victim's husband, time and thus opportunity were important elements in this case. Therefore, it was important that the evidence reveal the number and severity of the wounds to show whether the victim's husband would have had sufficient time to inflict such damage in the four or five minute time period as alleged by Puckett.

¶55. Accordingly, the trial court did not err in admitting into evidence the photographs as well as the videotape of the defendant.

## V. WHETHER DR. MICHAEL WEST SHOULD HAVE BEEN ALLOWED TO TESTIFY AS AN EXPERT IN THE FIELD OF WOUND PATTERNS?

¶56. Puckett argues that the trial court err in accepting Dr. Michael West as an expert in wound pattern analysis because Dr. West did not meet the *Polk* standards as established in *Polk v. State*, 612 So. 2d 381 (Miss. 1992). Specifically, Puckett points out that Dr. West was not properly qualified as a wound pattern expert for the following reasons: (1) Dr. West "failed to establish that there is a general acceptance of wound pattern analysis in the scientific community;" (2) "there is no certification for a wound pattern expert;" (3) there are "no techniques which are generally acceptable to produce reliable results in the field of wound pattern analysis;" and (4) there are no "techniques which could produce results at the level of reasonable medical probability or certainty." In contention, the State points out that Puckett's reliance on *Polk* is misguided since that decision specifically dealt with the use of expert testimony regarding DNA evidence. This Court agrees with the State's position regarding *Polk*.

¶57. The admissibility of expert testimony is governed by Rule 702 of the Mississippi Rules of Evidence.

If scientific, technical, **or other** specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill,

experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Miss. R. Evid. 702. This Court reviews the trial court's decision to allow expert testimony under the well-known clearly erroneous standard. "The admission of expert testimony is addressed to the sound discretion of the trial judge." *Roberts v. Grafe Auto Co.*, 701 So. 2d 1093, 1098 (Miss. 1997). "Unless we conclude that the discretion was arbitrary and clearly erroneous, amounting to an abuse of discretion, that decision will stand." *Id.* (*citing Seal v. Miller*, 605 So. 2d 240, 243 (Miss. 1992); *Hooten v. State*, 492 So. 2d 948, 950-51 (Miss. 1986)).

¶58. In *Sample v. State*, 643 So. 2d 524, 529-30 (Miss. 1994), this Court espoused a bright line rule regarding the difference between lay opinion under Miss. R. Evid. 701 and expert opinion testimony under Miss. R. Evid. 702. "That is, where, in order to express the opinion, the witness must possess some experience or expertise beyond that of the average, randomly selected adult, it is a Miss. R. Evid. 702 opinion and not a Rule 701 opinion. *Id.* (citations omitted). In other words, "[t]he test is whether a witness 'possesses peculiar knowledge or information regarding the relevant subject matter which is not likely to be possessed by a layman.'" *May v. State*, 524 So. 2d 957, 963 (Miss. 1988).

¶59. Additionally, this Court discussed at length the admissibility of expert testimony under Rule 702 in *Hall v. State*, 611 So. 2d 915 (Miss. 1992). As in the case at bar, the defendant in *Hall* argued that the State's witnesses could not be qualified as experts because there is no field in which they are qualified. *Id.* at 919. In *Hall*, the trial court found the State's witnesses to be experts on child abuse. *Id.* After delineating each witness's qualifications, this Court found that the State's witnesses were properly qualified as expert witnesses in the field of child abuse. *Id.* "Based on this record, they were **qualified by knowledge, skill, experience, training, and education** to assist the trier of fact" and "[a]s experts, they could testify as to commons symptoms and behavior which are **consistent with** sexual abuse." *Id*. (emphasis added).

¶60. In the case at bar, Dr. Michael West offered the following qualifications as predicate to his expert testimony in the field of wound patterns. He is a practicing general dentist and has served for three (3) years as the elected coroner of Forrest County, Mississippi. Upon graduation from University of Southern Mississippi, he attended and graduated from the LSU School of Dentistry. Thereafter, he entered the United States Air Force where he performed duties as a forensic dental officer, which primarily involved the identification of downed flight personnel. He also received training in forensics at the Armed Forces Institute of Pathology, Bethesda, Maryland. For twelve years, he has been a board certified Forensic Odontologist, which involves representing dental interests for the law usually in the form of dental identification, bite marks, third party liability, and malpractice. He is a member of the American Board of Forensic Odontology, the American Society of Forensic Odontology, the Mississippi Coroners Association, Mississippi Law Enforcement Association and the Association of Professional Investigative Photographers. He has been conducting death investigations for 19 years. Since 1990, Dr. West has analyzed wound patterns and pattern injuries on about 250 occasions. Additionally, Dr. West has conducted research in the manufacture of wound patterns. He has delivered approximately 24 presentations on the subject of wound patterns or patterned injuries. He has published over 25 articles on wound pattern photography and analysis. He has been accepted as an expert on wound pattern analysis in six or seven states, including Mississippi, and has testified or rendered an opinion on wound patterns or pattern injuries over sixteen (16) times.

¶61. After the prosecution laid the proper predicate and defense counsel conducted extensive voir dire, the

trial judge accepted Dr. West as an expert in the field of wound patterns. Dr. West testified that he was present at the autopsy performed on the victim, Rhonda Griffis, that he took the photographs and did the wound pattern analysis in this case. Dr. West also testified that he examined the defendant's body and photographed any marks or injuries that he had upon his arrest two days following Rhonda's murder. Dr. West testified the wounds on Puckett were **consistent with** the type of wounds which would be inflicted by State's Exhibit No. 3, the club which was found outside the Griffis' trailer. He also testified the blows inflicted on the victim were **consistent with** State's Exhibit No. 3. Based on the record in the case at bar, and in accordance with this Court's previous holdings, the Court should find that the trial judge properly qualified Dr. West as an expert witness in the field of wound patterns. Because of Dr. West's knowledge, skill, experience, training, and education, he possessed peculiar knowledge or information regarding wound patterns which is not likely to be possessed by a layman. Furthermore, as an expert, Dr. West was properly allowed to testify that the victim's wounds and the wounds discovered on Puckett's shoulder were consistent with State's Exhibit No. 3.

¶62. It is interesting to note that the pathologist, Dr. Steven Hayne, also testified that the victim's wounds were consistent with State's Exhibit No. 3 without objection. Furthermore, Puckett himself testified that State's Exhibit No. 3 was the murder weapon, only that David Griffis was the one who used it to beat his wife to death. Puckett also admitted being hit by David with that very same stick. Consequently, even if it had been error to allow Dr. West to testify as a wound pattern expert, his testimony could not have been prejudicial and harmful as Puckett himself confirmed everything Dr. West stated during his own testimony. Accordingly, the trial court did not err in allowing Dr. West to testify as an expert in the field of wound patterns.

## VI. WHETHER THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTIONS FOR MISTRIAL BASED ON PROSECUTORIAL MISCONDUCT?

¶63. Puckett argues that the trial court's denial of his motions for mistrial for two separate occasions of prosecutorial misconduct warrant reversal of this case. The first incident occurred during voir dire when defense counsel alleged four (4) attorneys from the District Attorney's staff were improperly participating in the trial. The second incident occurred when defense counsel alleged the prosecution exceeded an in-chambers agreement, during cross-examination of the victim's husband.

<u>**Participating Attorneys**</u>

¶64. During voir dire, defense counsel voiced the following objection.

> ADELMAN: I have an objection to the presence of four district attorneys parading in front of the jury constantly conferring with one another. The law is clear. There are two lawyers per case and whether or not they are questioning or not, they are running about; they are conferring with one another, and I object to that. I think the State should be restricted to having two attorneys just like the defense.. . .

Following some discussion between the prosecutor and the defense counsel, the trial judge indicated "the two that will be actively participating, interrogating witnesses and making opening statement and summation will be Honorable Rex K. Jones, the Honorable Robert Helfrich." The trial judge further indicated that the district attorney, Carter, and assistant district attorney, Pittman, have the right to be present in the courtroom as long as they are not actively participating, but cautioned Pittman and Carter not to be participating.

¶65. Thereafter, in chambers, defense counsel moved for a mistrial based on the fact that four (4) district attorneys were conferring with one another in front of the jury during voir dire. The trial judge denied the motion, cautioned the District Attorneys once again and indicated "as you well know under the rules only two will participate and so far only Jones and Helfrich have been participating." The trial judge further stated he didn't think there was anything that would preclude Carter and Pittman from being there for the purpose of consultation.

¶66. On appeal, defense counsel indicates "[t]he State is well aware of the fact that only two (2) attorneys are allowed to represent a party in the Twelfth Circuit Court District." However, as the State points out, defense counsel fails to cite any rule or authority for this limitation. The State also maintains this issue is moot since only two (2) attorneys participated in this case. Additionally, in his reply brief, Puckett fails to respond to the State's argument.

¶67. This Court agrees with the State's position and rule that there is no merit to this issue. Even though the trial judge acknowledged a rule governing this subject, there is nothing in the record indicating the source of this rule. "It is the appellant's duty to provide this Court with a record in support of the issues raised on appeal."***Robinson v. State***, 662 So.2d 1100, 1104 (Miss. 1995) (*citing* M.R.A.P. 11(c)). Furthermore, the trial court's ruling made it clear that "participating" referred to interrogating witnesses and making opening and closing statements. The rule prohibiting "participation" of more than two attorneys, did not prohibit the additional attorneys being present in the courtroom for consultation purposes. The additional attorneys present in the courtroom did not ask any questions of the jury panel, did not interrogate any witnesses, and did not make any opening or closing statements. Therefore, the defendant's assertion that more than two (2) attorneys "participated" in the trial is without merit. Accordingly, the trial court's decision should be affirmed.

## In-Chambers Agreement

¶68. Puckett argues that the trial court should have granted a mistrial when the prosecution asked a witness questions exceeding that which was previously agreed to in chambers. David Griffis was the victim's husband and was also the defendant's former employer. However, Griffis fired the defendant from his employment upon learning that a married female resident of the Canebrake community reported that one of his employees had scared her by following her while she was walking in the neighborhood. The woman provided Griffis with a description of the individual and later positively identified him. The State elicited testimony from Griffis limited to confirmation that the defendant was fired from his employment prior to his wife's murder. During cross-examination, defense counsel asked the following questions concerning the termination.

MR. ADELMAN:

Q. When you terminated Matt, you told him that he was terminated. Was there any type of hostile reaction or anything like that?

A. No.

Q. Did you in fact offer to recommend him for other employment?

A. No, I didn't.

**Q. You just told him he was terminated and that appeared to be the end of the matter?**

**A. I told him why he was terminated.**

Q. As you indicated, there was no hostile reaction or anything like that?

A. No.

(emphasis added). Following this dialog, the prosecution requested an in-chambers Rule 403 hearing regarding the admissibility of prior acts of the defendant under Rule 404(b). The prosecution argued that since defense counsel solicited information concerning the defendant's demeanor upon being told that he was terminated and the witness' response indicating that the defendant was given the reason why he was terminated, they should be allowed to cross-examine Griffis as to the reason for termination on a limited basis. Following a lengthy hearing and a proffer regarding the testimony, the trial judge ruled that Griffis would be allowed to testify concerning the following facts: (1) that a complaint was made by a married lady resident that the defendant scared her by walking with her, (2) that Griffis investigated the incident, (3) **that the defendant denied the incident**, and (4) that Griffis fired Puckett after identifying him as the individual complained about. The trial court then instructed the prosecution that they could not go into any hearsay concerning the matter. In the presence of the jury, the prosecution asked the following questions:

MR HELFRICH:

Q. So you fired Matt?

A. Yes.

Q. Why did you fire Matt?

A. Because of a complaint from a lady, a lady resident.

Q. What was the complaint about?

A. That he was following her on the walking track and scared her and made her uneasy.

Q. How did you determine that it was Matt?

A. I got the lady in my truck and I drove her by the area they were working at, and she identified him.

Q. Did you confront Matt?

A. Yes.

Q. What did he say?

A. He said that he never left the work area. He denied it.

Q. So he lied?

ADELMAN: Object.

THE COURT: Sustained.

ADELMAN: He is going outside and I will ask for a mistrial based on that question.

¶69. At this point, a conference was held outside the jury's presence. Defense counsel argued that the question exceeded the scope of their in-chambers agreement and that it was a prejudicial and inflammatory question. The prosecution argued that even if it was error, it was harmless error and it was not prejudicial since the testimony was already before the jury that the lady said he did it and the defendant said he did not. Consequently, the jury could have made the natural inference that in Griffis' opinion, Puckett had lied by the mere fact that Griffis did in fact terminate Puckett. Additionally, the jury could have also made an inference that Puckett lied regarding the incident based on their own beliefs concerning the credibility of the witnesses. The trial judge denied the defendant's motion for mistrial but gave the jury a precautionary instruction to totally disregard any inferences whatsoever concerning whether the defendant lied. All jurors agreed that they would follow the court's instructions.

¶70. In alleging prosecutorial misconduct sufficient to warrant a new trial, Puckett relies on *Smith v. State*, 457 So. 2d 327 (Miss. 1984) and *Hughes v. State*, 470 So. 2d 1046 (Miss. 1985). The State contends that *Smith* is distinguishable from the case at bar because *Smith* involved numerous instances of improper and prejudicial conduct. During the cross-examination in *Smith*, the prosecution insinuated criminal conduct which could not be proven, attempted to impeach a witness about a prior inconsistent statement when he knew the witness omitted the information in compliance with a court order, asked the witness about details of a crime for which she was under indictment, and repeatedly asked the witnesses in rebuttal whether they were being provided with a rent-free apartment even after defense counsel's objections regarding this subject were sustained. *Id.* at 334-35. The Court held "that the case must be reversed and remanded for a new trial in view of the **numerous instances of prosecutorial misconduct**."*Id.* at 336 (emphasis added). This Court agrees with the State's position and find that the case at bar is not controlled by this Court's *Smith* decision.

¶71. Puckett further maintains that this Court did not hesitate to reverse on the basis of prosecutorial misconduct in *Hughes*, which involves "prosecutorial misconduct strikingly similar to the second instance of prosecutorial misconduct in this case." However, a review of the *Hughes* decision reveals that it too is distinguishable from the case at bar. In *Hughes*, this Court stated,

> The dispositive assignment of error arises out of the State's subtle but effective effort to try Hughes for **offenses other than the charge in the indictment**, the sale of more than one ounce of marijuana on June 10, 1981. Specifically, the State put before the jury (a) the fact that after the date in question Hughes stated to Agent Washington that he had some "homegrown" marijuana, and (b) that Hughes was living with a woman without the benefit of marriage.

> \* \* \* \*

> When proof of a wholly unrelated drug offense **plus** proof that Hughes was having an illicit relationship with a woman without benefit of marriage were place before the jury, the chance that Hughes would be found guilty by reason of factors extraneous to the charge in the indictment was substantially increased in a legally impermissible way.

*Hughes*, 470 So. 2d at 1047.

¶72. Even if we were to assume that prosecutorial misconduct occurred in this case when the prosecution

asked Griffis his opinion as to whether or not Puckett had lied about the Canebrake incident, this instance comes nowhere near the seriousness of the conduct in the cases Puckett relies upon. In making his ruling, the trial judge in the case at bar, stated

> THE COURT: I did not want any hearsay before this jury. And some of the things that were contained in chambers did involve hearsay, and I did instruct the witness not to go into that. Helfrich did not attempt to elicit that. I think the only problem is with the final question because everything that Helfrich asked pretty much tracked that which was gone over in chambers. I think the only place where **he may have veered a little bit off dead center** was when he asked the question about whether or not the Defendant lied.

(emphasis added). By his comments, it is obvious that the trial judge did not believe the prosecution engaged in flagrant and intentional disregard of his prior ruling or of the prior in-chambers agreement. As previously mentioned, even if the question could be considered error, it was harmless error and not prejudicial since the testimony was already before the jury that the lady said he did it and the defendant said he did not. From this information, the jury could have made the natural inference that in Griffis' opinion, the defendant had lied by the mere fact that Griffis did in fact terminate Puckett. Additionally, the jury could have also made an inference that Puckett lied regarding the incident based on their own beliefs concerning the credibility of the witnesses. The jurors were told to disregard the comment, and they agreed that they would follow the court's instructions. "It is presumed that jurors follow the instructions of the court. To presume otherwise would be to render the jury system inoperable." *Chase v. State*, 645 So. 2d 829, 853 (Miss. 1994) (*quoting Johnson v. State*, 475 So. 2d 1136, 1142 (Miss. 1985)).

¶73. Therefore, this Court finds that any error by the prosecutor's was harmless under the facts of this case. The question did not cause such prejudice as to warrant a new trial, and any possible error was cured by the trial court's admonishment to the jury to disregard the prosecutor's question. Accordingly, the trial court's decision is affirmed.

## VII. WHETHER IT WAS IMPROPER AND REVERSIBLE ERROR FOR THE DISTRICT ATTORNEY TO INQUIRE OF THE DEFENDANT AS TO HIS POST-*MIRANDA* SILENCE?

¶74. Puckett argues the prosecution committed reversible error during cross-examination by improperly inquiring into the defendant's post-*Miranda* silence. *See Miranda v. Arizona*, 384 U.S. 436 (1966). Puckett did not raise an objection to these questions at trial[8] or raise this issue in his Motion for New Trial. However, Puckett now argues this issue should not be subject to the procedural bar, but should be considered by this Court under the plain or obvious error rule. Puckett cites *Williams v. State*, 445 So. 2d 798 (Miss. 1984) in support of his contention that this Court should consider this issue even though it was not raised before the lower court.[9] Puckett relies on the United States Supreme Court's decision in *Doyle v. Ohio*, 426 U.S. 610 (1976), and this Court's decisions in *Quick v. State*, 569 So. 2d 1197 (Miss. 1990) and *Johnson v. State*, 596 So. 2d 865 (Miss. 1992) as authority for his argument that the prosecution erred by questioning Puckett about his post-*Miranda* silence.

¶75. Here, testimony from several law enforcement personnel was offered to show Puckett made voluntary statements at the time of his arrest and after his arrest. Specifically, Sheriff Billy Magee testified that he was present at the time of Puckett's apprehension and arrest which was in close proximity to Puckett's mother's house. Sheriff Magee testified that at the time of his arrest, Puckett stated to his mother "[t]his is a lot of law enforcement for somebody who just committed a burglary." In addition, Michael Riels, a Forrest County

Sheriff's Office investigator, testified that upon Puckett's arrival at the Forrest County Regional Jail, sometime between 5:00 and 6:00 p.m., he read Puckett his *Miranda* rights. Investigator Riels indicated at that point in time he did not attempt to take a statement from Puckett, but that Puckett did make voluntary statements regarding his apprehension. Specifically, Riels stated,

> A. (Riels) At that time he was telling me that the way he was caught or apprehended was through the use of a helicopter. He was kind of upset with himself that he didn't lay still enough in the woods and that the reason he came on out was because a helicopter had - - he knew that he had been spotted, so he might as well come on out.

> Q. ( Jones) Was there anything else said at that time?

> A. (Riels) At that time I asked him if he got cold staying in the woods for a couple of days, was what I was referring to, how he survived out there for a couple of days, and at that time he told me that he was an Eagle Scout, and that he had picked cotton and put it in his boots to keep his feet warm, that he knew what roots to eat, and that the first night being out he stayed in a field and pulled two bales of hay together and stayed between those bales of hay, and the next night he slept in a loft of a barn.

¶76. Thereafter, Eddie Clark, Forrest County Deputy Sheriff, testified that at approximately 10:00 p.m., after advising Puckett of his Miranda rights, he interviewed Puckett at the Forrest County Jail. Deputy Sheriff Clark testified that Puckett made the following voluntary statements,

> A. (Clark) He stated it was a lot of police officers looking for someone that had just committed burglary, and he stated that his vehicle was in the wooded area where we had located it at because it had ran hot and he parked it there.

> * * * *

> Q. (Jones) And was that - - that was the extent of what he said to you on that occasion?

> A. (Clark) He stated he went to the residence to break into it, to steal money to pay a truck note.

> Q. (Jones) Okay. Did he deny - - did he admit or deny any involvement with the actual killing of the lady?

> A. (Clark) He said he hasn't killed anyone and didn't want to have any more conversation until he had an attorney present.

¶77. Puckett elected to take the stand in his own defense and testified as to the facts as previously indicated in the Statement of Facts. During Puckett's testimony, the prosecution asked Puckett why he never reported to anyone that he had just witnessed a man brutally beat his wife to death. Puckett testified that he did not go to his mother's house and call the police because his mother's car was not at the house when he arrived there. He testified that he did not go to the house where he had been living with Buck Hinton and his wife and report what he had witnessed because they were a long ways from his mother's house. He also testified that he did not go to the police department or Sheriff's office to report the incident because he did not know where they were located. This line of questioning is obviously pre-*Miranda* and thus Puckett does not allege any error with regards thereto.

¶78. However, Puckett contends that the prosecution committed reversible error in regards to the following three series of questions.

Q. (Jones) Who is the first person you told that story to?

A. (Puckett) My lawyer.

Q. (Jones) And when was that?

A. (Puckett) I don't have the date.

Q. (Jones) And if you're an innocent man, I mean, they're telling you to shut up an don't tell anybody?

A. (Puckett) That's what my momma said.

Q. (Jones) And you're innocent, you say?

A. (Puckett) Yes, sir.

Q. (Jones) Well, I know one thing; you haven't told anybody other than your mother and your lawyer on God's earth until today, have you?

A. (Puckett) I was told to keep quiet.

Q. (Jones) Keep quiet. An innocent man, who'd done nothing and witnessed a murder? They told you to keep quiet?

A. (Puckett) Yes, sir.

Q. (Jones) Why did they do that?

A (Puckett) That was my mother and my lawyer, and that's what they instructed me to do.

¶79. The first series of questions regarding to whom Puckett first told his story cannot positively be identified as **post**-*Miranda*. Because Puckett hid out in the woods for two (2) days prior to his arrest, this question very well could have been asked to ascertain whether Puckett had told his story to anyone prior to his arrest. However, the second and third series of questions are pertaining to what Puckett related after his arrest. Therefore, in light of Puckett's contention that this constitutes plain error, we will review this line of questioning both with regards to the procedural bar asserted by the State as well as on the merits.

## Procedural Bar

¶80. The State cites the following cases in support of its position that since defense counsel did not object to this line of questioning at trial and did not raise this issue in Puckett's Motion for a New Trial, that he is procedurally barred from raising it now on appeal. *See Wells v. State, 698 So. 2d 497, 514 (Miss. 1997); Lester v. State, 692 So. 2d 755, 771 (Miss. 1997); Davis v. State, 684 So. 2d 643, 658 (Miss. 1996); Blue v. State*, 674 So. 2d 1184, 1206 (Miss. 1996); *Holly v. State*, 671 So. 2d 32, 39 (Miss. 1996); *Cole v. State*, 525 So. 2d 365, 384 (Miss. 1996). The State further maintains that even if defense counsel's request to approach the bench is considered an objection, the objection was only to attorney/client privilege, not a due process violation for commenting on Puckett's post-*Miranda* silence.

Had he properly objected, the trial court may have been able to cure any possible error with an instruction to the jury. Furthermore, the State points out that this Court has held that an objection on one or more specific grounds constitutes a waiver of all other grounds. ***Walker v. State***, 671 So. 2d 581, 605-06 (Miss. 1995); ***Conner v. State***, 632 So. 2d 1239, 1255 (Miss. 1993); ***Fleming v. State***, 604 So. 2d 280, 292 (Miss. 1992). Moreover, this Court has also held that an objection at trial cannot be enlarged in the reviewing court to embrace omission not complained of at trial. ***McGarth v. State***, 148 So. 2d 494, 506 (Miss. 1963).

¶81. We agree with the State's position that this issue is procedurally barred, not only because an objection was not made at trial, but also because this issue was not raised in Puckett's Motion for New Trial. However, notwithstanding the procedural bar, we recognize that this Court has the authority to review some issues under the plain error rule. Puckett maintains that since this questioning violated Puckett's fundamental right, specifically his constitutionally protected right to remain silent, this Court should relax the rule requiring contemporaneous objection and invoke the plain error rule to prevent a serious and manifest miscarriage of justice.

> It has generally been held by this Court that issue must be raised at the trial level before they become ripe for consideration at the appellate level. This Court has noted on numerous occasions, however, that an exception to this general rule exists for issues affecting fundamental rights. Moreover, the Court has also proclaimed, "[w]e have in death penalty cases the prerogative of relaxing our contemporaneous objection and plain error rules when the interests of justice so require." Some issues are of such importance and of first impression that in spite of a statutory bar, this Court should proceed and address that particular issue.

***Foster v. State***, 639 So. 2d 1263 (Miss. 1994) (citations omitted). Accordingly, a review of this issue on the merits is appropriate to determine whether Puckett's fundamental rights were violated.

### Discussion of the Merits

¶82. Puckett cites the United States Supreme Court's decision in ***Doyle v. Ohio***, 426 U.S. 610 (1976), and this Court's decisions in ***Quick v. State***, 569 So. 2d 1197 (Miss. 1990) and ***Johnson v. State***, 596 So. 2d 865 (Miss. 1992) as authority for his argument that the prosecution erred by questioning Puckett about his post-***Miranda*** silence. However, a review of these cases reveals that the case at bar is clearly distinguishable.

¶83. First of all it should be noted that the ***Miranda*** warnings inform defendants of their right to remain silent, and that **any thing they do say can and will be used against them in a court of law**. In ***Miranda v. Arizona***, 384 U.S. 436 (1966), the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant **unless it demonstrates the use of procedural safeguards** effective to secure the privilege against self-incrimination." ***Id.*** at 444 (emphasis added). In reference to procedural safeguards the Supreme Court stated "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that **any statement he does make may be used as evidence against him**, and that he has a right to the presence of an attorney, either retained or appointed." ***Id.*** (emphasis added). Accordingly, when a defendant does not heed these warnings and invoke his right to silence, but voluntarily makes statements, it is not error for the prosecution to use these statements at trial against the defendant.

¶84. Secondly, the defendants in *Doyle* and *Quick* invoked their right to silence and made no statements to the police at the time of their arrest. Additionally, in *Johnson*, it was not clear from the record whether the defendant had invoked his right to silence. *Johnson*, 596 So. 2d at 866. This is obviously distinguishable from the case at bar since it is evident from the record that Puckett did not invoke his right to silence and made voluntary statements at the time of his arrest. As this Court stated in *Quick*, "[i]t is improper and, ordinarily, reversible error to comment on the accused's post-*Miranda* silence."*Quick*, 569 So. 2d at 1199 (emphasis added). Furthermore, as then Presiding Justice Hawkins pointed out "[i]n *Doyle* the U.S. Supreme Court held that if an accused under arrest was given a Miranda warning and told that he had a right to remain silent, **and the accused did remain silent**, that the government thereafter could not use his choice of remaining silent as a weapon during his trial testimony cross-examination to cast suspicion on his guilt or innocence. Simply put, the government cannot use an accused's exercise of a Constitutional right as a weapon to convict him . . .." *Johnson*, 596 So. 2d at 869 (Hawkins, P.J., dissenting) (emphasis added).

¶85. The purpose of *Miranda* is to protect the defendant's Fifth Amendment right against self-incrimination by affording him the right to remain silent. However, if the defendant does not take advantage of his right to remain silent, any statements he voluntarily makes can and will be used against him in a court of law. The United States Supreme Court's holding in *Doyle* simply reiterates that the defendant's **silence** cannot be used against him during cross-examination. However, **because Puckett did not invoke his right to silence**, and made voluntary statements, the *Miranda* and *Doyle* provisions do not apply. To hold otherwise would not only afford the defendant the right not to incriminate himself by remaining silent but would also afford him the right not to incriminate himself by making voluntary statements which are inconsistent with his testimony at trial. This would ultimately grant a defendant who chooses to be a witness in his own defense more protection than that granted to any other witness.

¶86. In the case at bar, after being placed under arrest and being read his *Miranda* warnings, Puckett made voluntary statements to his mother as well as to law enforcement officials. Specifically, in addition to other statements, Puckett made a comment to the effect that "this is a lot of law enforcement for somebody who just committed a burglary." This statement is inconsistent with his assertion at trial, that he had hid in the woods because he was scared of David Griffis after witnessing Griffis brutally murder his wife. Puckett's statement upon his arrest indicated that he was running from the police after committing a burglary. However, Puckett's statement at trial indicate that he was running from the police because he was afraid of Griffis. Therefore, the prosecutor's questions upon cross-examination are admissible under Miss. R. Evid. 613 to show that Puckett's prior statements were inconsistent with his statements at trial.

¶87. Accordingly, this Court finds that this issue is without merit and thus does not constitute plain error.

## VIII. WHETHER THE TRIAL COURT ERRED IN ALLOWING EVIDENCE OF THE "CANEBRAKE" INCIDENT AND ADMITTING THE 911 TAPE INTO EVIDENCE?

### Canebrake Incident

¶88. Puckett alleges that the trial court erred in allowing into evidence testimony concerning a prior bad act, specifically the Canebrake incident. Before trial, the prosecution brought a motion in limine to determine the admissibility of evidence concerning why Puckett was fired by David Griffis.[(10)] A hearing was held on the motion prior to trial. Defense counsel conceded evidence that Puckett was fired by Griffis would probably be admissible, but the reason why he was fired would not.

¶89. During Griffis' testimony, the prosecution only asked how Puckett left Griffis' employment. Upon Griffis' response that Puckett was fired from his employment, the prosecution did not inquire as to any details regarding the reason Puckett was fired.

¶90. During Griffis' cross-examination, defense counsel introduced a letter of recommendation for Eagle Scout,[(11)] which Griffis' had written for Puckett prior to his termination. Thereafter, the following colloquy ensued:

> Q. (MR. ADELMAN) At Canebrake, was Matt an employee of yours or an employee of Canebrake's?
>
> A. (DAVID GRIFFIS) Canebrake's.
>
> Q. Did you terminate him or did Canebrake terminate him?
>
> A. I did.
>
> Q. But he was an employee of Canebrake's?
>
> A. Yes.
>
> Q. When you terminated Matt, you told him that he was terminated. Was there any type of hostile reaction or anything like that?
>
> A. No.
>
> Q. Did you in fact offer to recommend him for other employment?
>
> A. No. I didn't.
>
> Q. You just told him he was terminated and that appeared to be the end of the matter?
>
> A. I told him why he was terminated.
>
> Q. As you indicated, there was no hostile reaction or anything like that?
>
> A. No.

Before re-direct, the prosecution asked for a hearing outside the jury's presence and argued that during Griffis' cross-examination, Puckett had opened the door for the jury to know why he was terminated by Griffis. The prosecution then made a proffer of Griffis' proposed testimony, and the trial court allowed it into evidence.

¶91. Puckett maintains that this testimony does not meet the requirements of Miss. R. Evid. 404(b) which specifically provides as follows:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of the person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Specifically, Puckett argues that "this prior incident has no probative value regarding 'opportunity, intent, preparation, plan, knowledge, identify [sic] or absence of mistake or accident." Puckett further maintains "if the State is alleging 'motive' as a basis for this exception, the substantial distance in time between the two events defeats this argument." Puckett cites no authority for his contention that the distance in time between the two events defeats it being used as proof of motive and this Court does not find that a three (3) month time span is so substantial as to defeat the argument that Puckett's motive for murdering David's wife was to get back at David for firing him from his employment.

¶92. Additionally, this Court finds the testimony was properly allowed into evidence under Miss. R. Evid. 404(a)(1). As this Court previously stated,

> The defendant in a criminal case may offer his good character to evidence the improbability of his doing the act charged. Miss. R. Evid. 404(a)(1); IA Wigmore, Evidence § 56 (Tillers rev. 1983). [The defendant] offered this evidence when he stated that he would not hurt anyone in order to obtain money. The prosecution may then offer evidence of a pertinent trait to rebut the same. Miss. R. Evid. 404(a)(1).

> The prosecution may not offer evidence of the accused's character unless and until the accused has raised the issue by offering evidence of his good character. If and when the accused has raised the issue of his character, the prosecution may then offer evidence of the accused's bad character.

> . . . A defendant's character is put in issue when he states that he has a good character or a good record, or when he otherwise offers evidence of good character. (emphasis added) 1 Wharton's Criminal Evidence § 169 (1985).

*Rowe v. State*, 562 So. 2d 121, 123 (Miss. 1990) (footnote omitted). Consequently, in the case at bar, once Puckett offered evidence of his good character in the form of the glowing recommendation letter from Griffis and the fact that he did not act hostile upon his termination, this opened the door for the prosecution to offer evidence in rebuttal proving otherwise. Accordingly, this testimony was properly admitted under Rule 404(a)(1).

¶93. Puckett further alleges that he "is entitled to reversal because of the failure of the Court to follow the requirements set forth by this Court in *Bounds v. State*, 688 So. 2d 1362, 1373 (Miss. 1997). In *Bounds*, this Court cited *Smith v. State*, 656 So. 2d 95 (Miss. 1995), for the proposition that "in the future whenever 404(b) evidence is offered, and there is an objection which is overruled, the objection shall be deemed an invocation of the right to a MRE 403 analysis and a **limiting instruction**."*Bounds*, 688 So. 2d at 1372 (*citing Smith*, 656 So. 2d at 100). Puckett's argument would be correct had the testimony been admitted under Rule 404(b). However, since we find the testimony admissible under Rule 404(a), the trial court's failure to issue a limiting instruction sua sponte is harmless error.

## 911 Tape

¶94. Puckett also alleges the trial court erred by allowing the jury to hear State's Exhibit No. 21-A, a tape of several 911 calls which were placed from the Griffis' residence and the Hatten's residence on the day of the murder. Specifically, Puckett alleges the 911 tape is cumulative, constitutes hearsay, and should have been excluded since its probative value is substantially outweighed by its prejudicial effect.[12]

¶95. In ***Clark v. State***, 693 So. 2d 927 (Miss. 1997), this Court held "[t]he circuit court correctly found that the 911 call was admissible under either the present sense impression or excited utterance exceptions to the rule against hearsay." ***Id.*** at 932. The prosecution was required to prove that Puckett committed this crime beyond a reasonable doubt *and* to the exclusion of every reasonable hypothesis consistent with innocence. Since Puckett's defense hinged on his allegation that David Griffis was the individual who actually killed Rhonda, the 911 tapes were extremely probative in determining this allegation. Accordingly, the trial court did not err in allowing the jury to hear the 911 tape.

## IX. WHETHER THE TRIAL COURT ERRED IN REFUSING TO REDUCE THE CHARGE AGAINST THE DEFENDANT FROM CAPITAL MURDER TO SIMPLE MURDER AND FURTHER ERRED IN AMENDING OVER OBJECTION INSTRUCTION D-13 AS PROPOSED BY DEFENDANT?

¶96. The Mississippi Sexual Battery statute states in pertinent part:

(1) A person is guilty of sexual battery if he or she engages in sexual penetration with:

(a) Another person without his or her consent;

(b) A mentally defective, mentally incapacitated or physically helpless person;

or

(c) A child under the age of fourteen (14) years.

Miss. Code Ann. § 97-3-95 (1994). Furthermore, § 97-3-97 provides definitions of certain relevant language contained within § 97-3-95 and states:

For purposes of sections 97-3-95 through 97-3-103 the following words shall have the meaning ascribed herein unless the context otherwise requires:

(a) "Sexual penetration" includes cunnilingus, fellatio, buggery or pederasty, any penetration of the genital or anal openings of another person's body by any part of a person's body, and insertion of any object into the genital or anal openings of another person's body.

(b) A "mentally defective person" is one who suffers from a mental disease, defect or condition which renders that person temporarily or permanently incapable of knowing the nature and quality of his or her conduct.

(c) A "mentally incapacitated person" is one rendered incapable of knowing or controlling his or her conduct, or incapable of resisting an act due to the influence of any drug, narcotic, anesthetic, or other substance administered to that person without his or her consent.

(d) A "physically helpless person" is one who is unconscious or one who for any other reason is physically incapable of communicating an unwillingness to engage in an act.

Miss. Code Ann. § 97-3-97 (1994). Puckett was indicted for the murder of Rhonda Hatten Griffis while engaged in the commission of the crime of sexual battery in violation of § 97-3-95(1)(a).

## Capital Murder v. Simple Murder

¶97. Puckett argues that the State failed to establish the underlying felony of sexual battery; therefore, the charge against him should have been reduced from capital murder to simple murder. Specifically, Puckett maintains that notwithstanding the evidence of injury to the victim's vagina, there was no evidence whatsoever of libidinal gratification or sexual behavior[(13)] as required by this Court's holding in *Roberson v. State*, 501 So. 2d 398 (Miss. 1987). Puckett contends "[t]he language of this Court's decision in *Roberson* is clear: in order to meet the definition of sexual penetration announced in Section 97-3-97 of the Mississippi Code of 1972, as amended, an essential element of the crime of Sexual Battery, the activities in question must be the 'product of sexual behavior or libidinal gratification.'"

¶98. On the other hand, the State maintains that *Roberson* did not create an additional element of proof that is not contained within the statute. The State further maintains that *Roberson* specifically addressed innocent insertion of an object into a child's anal or vaginal openings such as would be performed during clinical examinations or domestic, parental functions.

¶99. In *Roberson*, this Court considered whether the definition of sexual penetration was vague and thus violative of due process. The defendant in *Roberson* maintained the statutory definition of sexual penetration includes any penetration and therefore subjects physicians and parents to criminal prosecution for innocent insertion of an object into the child's genital or anal openings, even if it is done for clinical examinations or domestic, parental functions. However, this Court stated

> Although, on its face, the definition of sexual penetration announced in § 97-3-97 encompasses *any* penetration, the Court holds the parameters of the definition of sexual penetration are logically confined to activities which are the product of sexual behavior or libidinal gratification, not merely the product of clinical examinations or domestic, parental functions. As stated in **U.S, v. Harriss**, 347 U.S. at 618, 74 S.Ct. At 812, 98 L.Ed. at 996, "[I]f [the] general class of offenses can be made constitutionally definite by a reasonable construction of the statute, this Court is under a duty to give the statute that construction."

*Roberson*, 501 So. 2d at 400-01.

¶100. This Court agrees that Puckett's reliance on *Roberson* is misplaced. The defendant in *Roberson* was convicted of sexual battery of a child under the age of twelve.[(14)] Accordingly, the holding in *Roberson* was limited to § 97-3-95(1)(c), that portion of the statute dealing with sexual penetration of a child. Furthermore, *Roberson* merely announced that **innocent** insertion of objects into a child's vagina such as **for the purpose of clinical examinations or domestic, parental functions** does not violate the statute. It is unfathomable for this Court to imagine that anyone could claim that the forceful insertion of a wooden club or other instrument into a woman's vagina without her consent could ever be **innocent** so as to fit within the parameters of the *Roberson* decision.

¶101. The statute clearly prohibits the insertion of any object into the genital or anal openings of another person's body without his or her consent. *See* Miss. Code Ann. §§ 97-3-95(1)(c) and 97-3-97(a). Puckett's assertion that the lack of seminal fluid was sufficient evidence that the act was not the product of sexual behavior or libidinal gratification is futile. It is rather obvious that seminal fluid is not the natural by-product of inserting an object into the genital or anal opening of another person's body. There was sufficient evidence of sexual penetration notwithstanding the lack of seminal fluid. Dr. Haynes testified that the

bleeding from the vaginal vault was due to numerous lacerations and trauma that was consistent with a blunt object being inserted with force into the vaginal opening.

¶102. Although it may be difficult for the average citizen to consider the insertion of such an object into a women's vagina as sexual behavior, the statute contemplates such behavior and specifically prohibits such behavior that is performed **without consent**. Accordingly, there is no merit to this assignment of error.

## Instruction D-13

¶103. Puckett maintains the trial judge committed reversible error in amending Instruction D-13 which read:

> The Court instructs the Jury that in order to find the Defendant guilty of Capital Murder, you must find that the Defendant wilfully and feloniously, with malice or forethought, killed and murdered Rhonda Hatten Griffis, while engaged in the commission of the crime of Sexual Battery upon Rhonda Hatten Griffis.
>
> Sexual Battery occurs when a Defendant engages in sexual penetration with another person without his or her consent. Sexual penetration includes cunnilingus, fellation, buggery, or pederasty, any penetration of the genital or anal openings of another person's body by any part of a person's body, and insertion of any object into the genital or anal openings of another person's body. However, such penetration must be the product of sexual behavior or for the purpose of libidinal gratification *not merely the product of clinical examinations or domestic, parental functions*.[15] In this case, the State of Mississippi alleges that Defendant unlawfully, wilfully and feloniously engaged in sexual penetration with Rhonda Hatten Griffis without her consent by inserting a wooden club or other instruments into her vagina.
>
> The State of Mississippi must prove the allegation of Sexual Battery beyond a reasonable doubt and to the extent of every other reasonable hypothesis. If the State of Mississippi fails to prove each and every element of this allegation, then the State of Mississippi has failed to prove sexual penetration and you cannot find the Defendant guilty of Capital Murder during the commission of Sexual Battery.

¶104. Even if Puckett's reliance on *Roberson*, a case dealing with sexual battery of a child, were not unfounded, it is obvious that Puckett's attempt to add only a portion of the language contained within the Court's holding would only serve to mislead the jury. Under the facts presented in the *Roberson* case, the Court's holding specifically addressed the defendant's contention that a parent or a physician could be criminally implicated for **innocently** inserting an object into the genital or anal openings of a child while performing domestic, parental functions or performing clinical examinations. To add the language proposed by the defendant but omit the language added by the trial judge would totally eschew the intent of this Court's holding in that case. Furthermore, inasmuch as Puckett does not contend that the wooden club was inserted into the victim's vagina for parental or medical examination purposes, his argument is absurd.

¶105. Accordingly, this Court finds that the trial court did not err in refusing to reduce the charge against Puckett from capital murder to simple murder, or in amending Instruction D-13.

## X. WHETHER VIEWING THE EVIDENCE IN THE LIGHT MOST FAVORABLE TO THE STATE, A REASONABLE HYPOTHETICAL JUROR COULD HAVE FOUND DEFENDANT GUILTY BEYOND A REASONABLE DOUBT?

¶106. Puckett maintains there was insufficient evidence presented for a reasonable hypothetical jury to find him guilty beyond a reasonable doubt and points to the following deficiencies in support of his argument: (1) no seminal fluid was identified from the sexual assault kit; (2) hair samples recovered at the victim's residence failed to match the defendant's; (3) no seminal fluid was recovered from a sample of carpet taken from the victim's residence; (4) testing of the coveralls worn while in the victim's residence revealed only the presence of several stains from deer blood and one stain which could be identified only as human protein, but not as a specific body fluid; and (5) the State failed to establish beyond a reasonable doubt that the stick admitted into evidence as State's Exhibit No. 3 was in fact the murder weapon.

> Where a defendant has moved for j.n.o.v. [judgment of acquittal notwithstanding the verdict], the trial court must consider all of the evidence -- not just the evidence which supports the State's case -- in the light most favorable to the State. The State must be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. *Glass v. State*, 278 So. 2d 384, 386 (Miss. 1973) . If the facts and inferences *so considered* point in favor of the defendant with sufficient force that reasonable men could not have found *beyond a reasonable doubt* that the defendant was guilty, granting the motion is required. On the other hand, if there is substantial evidence opposed to the motion -- that is, evidence of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable fairminded men in the exercise of impartial judgment might reach different conclusions -- the motion should be denied.

*May v. State*, 460 So. 2d 778, 781 (Miss. 1984).

### Lack of Seminal Fluid

¶107. We first address Puckett's contention that the State's case was fatally flawed because no seminal fluid was found either from the sexual assault kit or from testing of the carpet in the victim's residence. The State's case in regards to sexual assault was based upon the fact that sexual penetration with a wooden club (State's Exhibit No. 3) had occurred without the victim's consent. The fact that no seminal fluid was detected is not a fatal defect since one would not logically expect seminal fluid to naturally result from sexual assault perpetrated by a wooden club.

### Lack of Hair Samples

¶108. Puckett's next contention that hair samples taken from the victim's residence is also not fatally defective to the State's case. The State's case did not rely on the presence of hair samples in the victim's residence in order to establish the fact that Puckett was in the residence at the time of the murder. Puckett's presence in the victim's residence on the day of the murder was established by several eye-witnesses, Nancy Hatten, David Griffis and Jeffrey Griffis. Additionally, Puckett himself testified not only that he was in the victim's residence on the day of the murder, but that he was in fact present during the commission of the murder. Consequently, hair samples were not necessary to establish Puckett's presence in the victim's trailer.

### Lack of Human Blood on Coveralls

¶109. Puckett's contention that testing of his coveralls failed to establish the presence of human blood. The testimony was that some human protein was found but that it was not a sufficient amount to establish the type of human protein. So it was not conclusively established that there was or was not human blood on the

coveralls. Additionally, David Griffis testified that Puckett was wearing zip-up coveralls on the day of the murder, but the coveralls tested were button-up coveralls. Accordingly, the jury could have inferred that the coveralls tested were not the coveralls that Puckett wore to the victim's house on the day of the murder.

### Failure to Establish State's Exhibit No. 3 as the Murder Weapon

¶110. Puckett's final contention that the State failed to establish beyond a reasonable doubt that the stick admitted into evidence as State's Exhibit No. 3 was in fact the murder weapon is the most incredible argument of all. Puckett himself testified that he witnessed David Griffis beat Rhonda Griffis with the stick that was admitted into evidence as State's Exhibit No. 3. Therefore, in order for the jury to believe that State's Exhibit No. 3 was not the murder weapon, Puckett is urging the jury and this Court to totally disregard his own testimony.

¶111. On the other hand, the State points to the following facts which they contend provide more than sufficient evidence of Puckett's guilty verdict: (1) Puckett was fired from his job by David Griffis; (2) Puckett was seen at the scene by Nancy Hatten, David Griffis, and Jeffrey Griffis; (3) Puckett admitted holding the stick and attempting to scare away Nancy Hatten; (4) there was blood on the club he held; (5) Nancy heard a scream from the trailer before David even returned home; (6) Puckett claimed he witnessed the murder and that David Griffis was the individual who brutally beat to death Rhonda Griffis with State's Exhibit No. 3. The State maintains that Puckett's story was incredible and "[t]he jury clearly believed the circumstantial evidence and the testimony of David Griffis and Nancy Hatten."

> This Court has in numerous cases, too many to mention, said that when the evidence is conflicting, the jury will be the sole judge of the credibility of witnesses and the weight and worth of their testimony. . . . We have repeatedly held that in a criminal prosecution the jury may accept the testimony of some witnesses and reject that of others, and that they may accept in part the evidence and reject in part the evidence on behalf of the state or on behalf of the accused. In other words, the credibility of witnesses is not for the reviewing court.

*Gathright v. State*, 380 So. 2d 1276, 1278 (Miss. 1980) (citations omitted).

¶112. A review of the evidence in the light most favorable to the State, along with all inferences tending to support the verdict, reveals that there is more than enough evidence to support a guilty verdict. Although not specifically addressed by the State, this Court should find the inconsistency in Puckett's allegation that David killed Rhonda within a four or five minute time period while the physical evidence establishing that David's second 911 call was placed 18 seconds after his first 911 call was terminated, especially convincing of Puckett's guilt. Accordingly, this assignment of error is without merit.

## XI. WHETHER THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO EXEMPT PHASE II FROM SEQUESTRATION?

¶113. Prior to trial, Puckett moved that certain potential phase 2 witnesses be excluded from sequestration, so these witnesses could remain in the courtroom during the guilt phase of the trial. The trial court took this motion under advisement. Puckett later amended his motion to exempt only his mother, Mary Puckett, from the rule. However, the trial court denied Puckett's motion, indicating that even though it was a bifurcated or two-stage hearing, if the rule was invoked, she would not be privileged to be in the courtroom during any stage of the proceedings.

¶114. Puckett alleges that the exclusion of his mother from being present during the first phase of trial, and for most of the second phase of trial, did not serve the ends of justice and therefore constituted harmful and prejudicial error requiring reversal of his conviction. In support of his argument, Puckett relies on this Court's decision in *Moffett v. State*, 540 So. 2d 1313 (Miss. 1989) wherein the defense alleged a violation of the sequestration rule. However, as the State points out, the case at bar is distinguishable from *Moffett* in that Puckett is not arguing that the trial court violated the sequestration rule. Instead, Puckett argues that the trial judge's strict adherence to the rule constitutes reversible error.

¶115. The rule governing sequestration of potential witnesses states:

> At the request of a party the court **shall** order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of his cause.

Miss. R. Evid. 615 (emphasis added). The language of the rule provides that all witnesses will be excluded unless they meet one of the exceptions. This Court has previously pointed out that under the mandatory language of the rule, the trial court does not have any discretion in its application but must apply it when a party invokes it. *Brown v. State*, 682 So.2d 340 (Miss. 1996) (*citing Douglas v. State*, 525 So. 2d 1312, 1316 (Miss. 1988)). The court's discretion comes in when the rule has been violated since the remedy for violation is left to the trial court's discretion. *Brown*, 682 So. 2d at 349 (*citing Douglas*, 525 So. 2d at 1317 (*citing United States v. Warren*, 578 F.2d 1058, 1076 (5th Cir. 1978))). The *Douglas* decision provides a good discussion of pre-Rule and post-Rule application of the sequestration rule.[16]

> In pre-Rules cases this Court generally held that it is in the trial court's discretion to allow a witness to testify on rebuttal even though he has been in the courtroom after The Rule has been invoked. . . .

> Pre-Rules cases, however, were based on the premise that the sequestration rule was a procedural matter and its enforcement at trial is left to the sole discretion of the trial judge. Under the new M.R.E. 615, judicial discretion is more limited than it was under our pre-Rules cases. Now sequestration is a matter of right except for the three categories of witnesses spelled out in the Rule, as evidenced by the language "at the request of a party the court *shall* order witnesses excluded . . ." except those witnesses enumerated in the Rule. This change in practice has been noted by the federal courts in construing F.R.E. 615, from which M.R.E. 615 was adopted *verbatim.*. . .

> \* \* \* \*

> The federal courts have also construed the Rule to apply to rebuttal witnesses -- to rebuttal witnesses who have testified during the case-in-chief as well as to rebuttal witnesses who have not testified during the case-in-chief.

*Douglas v. State*, 525 So. 2d at 1316 (citations omitted). In the case at bar, Puckett does not allege there was a violation of the Rule. Additionally, Puckett does not allege that his mother fits within one of the exceptions provided by the Rule. Accordingly, this Court should not fault the trial judge for adhering to the mandatory language of Rule 615. Furthermore, since the trial judge's discretion only applies to violations of the Rule and not to the application of the Rule, Puckett's allegation that the trial judge abused his discretion

is without merit. Consequently, the trial court's ruling should not be overturned.

## XII. WHETHER THE TRIAL COURT'S LIMITING INSTRUCTION DEFINING "ESPECIALLY HEINOUS, ATROCIOUS OR CRUEL" WAS CONSTITUTIONALLY VALID?

¶116. Sentencing Instruction No. S-4 reads as follows:

The Court instructs the jury that in considering whether the capital offense was especially heinous, atrocious, or cruel; heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; and cruel means designed to inflict a high degree of pain with indifference to, or even enjoyment of the suffering of others.

An especially heinous, atrocious or cruel capital offense is one accompanied by such additional acts as to set the crime apart from the norm of capital murders -- the conscienceless or pitiless crime which is unnecessarily tortuous to the victim. If you find from the evidence beyond a reasonable doubt that the defendant utilized a method of killing which caused serious mutilation, that the defendant inflicted physical or mental pain before death, that there was mental torture and aggravation before death, or that a lingering or tortuous death was suffered by the victim then you may find this aggravating circumstance.

¶117. Puckett contends that the trial court's granting of this instruction constitutes prejudicial and harmful error. Specifically, Puckett maintains that language identical to the first paragraph of the above instruction (Part A) was held unconstitutional by the United States Supreme Court in *Shell v. Mississippi*, 498 U.S. 1 (1990). Puckett admits the language of the first sentence of the second paragraph (Part B) was held to be constitutional by the United States Supreme Court in *Clemons v. Mississippi*, 494 U.S. 738 (Miss. 1990). However, Puckett contends that even though the language of the entire last sentence of the above instruction (Part C), is not unconstitutionally vague like the language of Part A, it is highly prejudicial and legally tenable.

¶118. In *Jackson v. State*, 684 So. 2d 1213 (Miss. 1996), this Court discussed a sentencing instruction with language identical to that granted by the trial court at Puckett's trial. As in the case at bar, the defendant in *Jackson* alleged that the instruction was overbroad and unconstitutionally vague. However, this Court approved the language of the sentencing instruction in *Jackson*, specifically stating,

A brief analysis of the instruction, however, shows that both this Court and the United States Supreme Court have found this language sufficient to limit the jury's consideration of the "heinous, atrocious or cruel" aggravating circumstance.

In *Shell v. Mississippi*, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed. 2d 1 (1990), the United States Supreme court found that used alone, language identical to that used in the first paragraph of the instruction was not constitutionally sufficient. However, language used in the first sentence of the second paragraph:

An especially heinous, atrocious or cruel capital offense is one accompanied by such additional acts as to set the crime apart from the norm of murders -- the conscienceless or pitiless crime which is unnecessarily torturous to the victim.

was determined by the United States Supreme Court to be a proper limiting instruction to the *Shell*

language in *Clemons v. Mississippi*, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed. 2d 725 (1990). Finally, in *Hansen v. State*, 592 So. 2d 114 (Miss. 1991), we noted that when considering whether a crime could be considered "especially heinous, atrocious, or cruel," it had stated in *Pinkney v. State*, 538 So. 2d 329, 357 (Miss. 1988), vacated on other grounds, 494 U.S. 1075, 110 S.Ct. 1800, 108 L.Ed. 2d 931 (1990), that:

barbarity sufficient to satisfy this aggravating circumstance can be demonstrated by showing that the defendant utilized a method of killing which caused serious mutilation, where there is dismemberment of the corpse, where the defendant inflicted physical or mental pain before death, or where a lingering or tortuous death was suffered by the victim.

*Hansen*, 592 So. 2d at 152. Although this aspect of *Pinkney* was not addressed in the United States Supreme Court's review of the case, similar limiting language, also like that employed in the last sentence of [the instruction], was approved in *Lewis v. Jeffers*, 497 U.S. 764, 768-70, 110 S.Ct. 3092, 3096, 111 L.Ed. 2d 606, 615-16 (1990) and *Walton v. Arizona*, 497 U.S. 639, 645-47, 110 S.Ct. 3047, 3053, 111 L.Ed. 2d 511, 523-24 (1990). Accordingly, we find no merit to this assignment of error.

*Jackson v. State*, 684 So. 2d 1213, 1236-37 (Miss. 1996) (footnote omitted).

¶119. In rebuttal, Puckett maintains that this Court's reliance on *Lewis v. Jeffers*, and *Walton v. Arizona*, is misguided because there is no language in either opinion "that can even be remotely construed to support the continued use of the language condemned in *Shell*." This argument misconstrues the *Shell* decision, which held that this language was not constitutionally **sufficient** since it was too vague to provide guidance to the sentencer. The *Shell* decision did not find the language to be constitutionally **invalid**. Instead, the United States Supreme Court pointed out "a limiting instruction can be used to give content to a statutory factor that 'is itself too vague to provide any guidance to the sentencer' only if the limiting instruction's own 'definitions are constitutionally sufficient,' that is, only if the limiting instruction itself 'provide[s] some guidance to the sentencer.'" *Shell*, 111 498 U.S. at 3 (*quoting* *Walton v. Arizona*, 497 U.S. 639 (1990)) . Accordingly, the language in Part C is part of the limiting instruction that provides guidance to the sentencer.

¶120. Further, Puckett maintains that "[t]he United States Supreme Court has not approved any limiting instruction for Mississippi's "especially heinous, atrocious, or cruel" aggravator other than the specific language approved in *Shell*, *Maynard* v. Cartwright, 486 U.S. 356, 108 S. Ct. 1853, 100 L. Ed. 2d 372 (1988), and *Clemons*, i.e., Part B only of the limiting instruction given in this case . . .."

¶121. However, as mentioned by this Court in *Jackson*, language similar to Part C was approved in *Lewis* and *Walton*.

"The element of cruelty involves the pain and the mental and physical distress visited upon the victims. Heinous and depraved involve the mental state and attitude of the perpetrator as reflected in his words and actions. 'Heinous' means 'hatefully or shockingly evil; grossly bad'; 'cruel' means' disposed to inflict pain esp. In a wanton, insensate or vindictive manner; sadistic'; and 'depraved' or vindictive manner; sadistic'; and 'depraved' means 'marked by debasement, corruption, perversion or deterioration.'" 135 Ariz., at 429, 661 P.2d, at 1130 (citations omitted).

* * * *

[W]e resolved any doubt about the matter in *__Walton v. Arizona__*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511, where we upheld, against a vagueness challenge, the precise aggravating circumstance at issue in this case. *See* 497 U.S., at 652-655, 110 S.Ct., at 3056-58. Our holding in *Walton*, which disposes of respondent's claim that Arizona has not construed its subsection (F)(6) aggravating circumstance in a constitutionally narrow manner, bears repeating here:

"Recognizing that the proper degree of definition of an aggravating factor of this nature is not susceptible of mathematical precision, we conclude that the definition given to the 'especially cruel' provision by the Arizona Supreme Court is constitutionally sufficient because it gives meaningful guidance to the sentencer. Nor can we fault the state court's statement that a crime is committed in an especially 'depraved' manner when the perpetrator '**relishes the murder, evidencing debasement or perversion,' or 'shows an indifference to the suffering of the victim and evidences a sense of pleasure' in the killing**." 497 U.S., at 655, 110 S.Ct., at 3058 (citation omitted).

*Lewis*, 497 U.S. at 769-77 (emphasis added).

¶122. Contrary to Puckett's assertion, this Court should find that the language of Part C in the case at bar is very similar to the language approved by these United States Supreme Court decisions. Consequently, this assignment of error is without merit.

## XIII. WHETHER THE STATE ADDUCED EVIDENCE TO SUPPORT THE PROPOSITION THAT THE MURDER WAS COMMITTED FOR THE PURPOSE OF AVOIDING OR PREVENTING THE DETECTION AND LAWFUL ARREST OF DEFENDANT?

¶123. Puckett argues that the trial court erred in allowing the jury to consider the aggravating circumstance that the murder was committed for the purpose of avoiding or preventing lawful arrest in Sentencing Instruction 2. Specifically, Puckett maintains that the State presented no evidence to support the "avoiding arrest" aggravator.

¶124. In contention, the State points to several instances of credible evidence upon which the jury could find beyond a reasonable doubt that the aggravating factor occurred. First, Puckett testified that after the idea of breaking into the Griffis' trailer "popped" into his mind, he drove by the trailer several times to see if anybody was at home. Second, Puckett parked his truck in a vacant lot beside the trailer. Third, Puckett put on a pair of coveralls and grabbed a pair of gloves from his truck. Fourth, Puckett also stated he picked the trailer because it was off by itself. Fifth, when he was seen by Rhonda's mother, he immediately came toward her with the club raised and told her to be quiet.

¶125. In discussing the standard of review regarding aggravating circumstances, this Court stated "the question becomes whether or not there was any credible evidence upon which the jury could find the aggravating circumstances in question, contradictory to [the defendant's] version." *Lanier v. State*, 533 So. 2d 473 (Miss. 1988). Additionally, this Court also stated

If there is evidence from which it may be reasonably inferred that a substantial reason for the killing was to conceal the identity of the killer or killers or to 'cover their tracks' so as to avoid apprehension and eventual arrest by authorities, then it is proper for the court to allow the jury to consider this aggravating circumstance.

Under this construction the Court properly submits this aggravator to the jury, if evidence existed from which the jury could reasonably infer that concealing the killer's identity, or covering the killer's tracks to avoid apprehension and arrest, was a substantial reason for the killing.

*Hansen v. State*, 592 So. 2d 114, 153 (Miss. 1991) (*quoting **Leatherwood v. State***, 435 So. 2d 645, 651 (Miss. 1983)).

¶126. It was determined at trial that Rhonda and her family knew Puckett prior to the murder. Puckett testified that he saw Rhonda's car in the driveway before he went to the door of the trailer. Whether Puckett went to the trailer to steal money or to carry out his sexual fantasies, the fact that Puckett took extra steps not to be detected and the fact that he knew Rhonda could identify him, provided some credible evidence upon which the jury could find that Puckett killed Rhonda in an effort to avoid apprehension. Additionally, the fact that Puckett came towards Rhonda's mother with the stick raised also provides sufficient evidence upon which the jury could infer that had he not been interrupted by David Griffis, Puckett also intended to kill Nancy Hatten in order to avoid detection. Accordingly, the trial court's granting of this instruction was not reversible error.

## XIV. WHETHER THE TRIAL COURT ERRONEOUSLY INSTRUCTED THE JURY AS TO PENALTIES?

¶127. The court instructed the jury that it must decide whether the defendant will be sentenced to death or life imprisonment without parole. Puckett argues that life with the possibility of parole should have been included as a sentencing option. Puckett further submits that the court wrongfully injected questions regarding parole into the statutory sentencing alternatives. In response to Puckett's objection at trial, the trial judge ruled that by virtue of §§ 47-5-139(1)(a) and 47-7-3(1)(e)-(f) the Legislature had effectively eliminated the possibility of parole from someone convicted of capital murder, regardless of what the jury verdict said about parole.

¶128. The following statutes are relevant to determination of this issue.

Upon conviction or adjudication of guilt a defendant of capital murder or other capital offense, the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death, life imprisonment without eligibility of parole, or life imprisonment. . . .

Miss. Code Ann. § 99-19-101(1) (1994).

If the jury cannot, within a reasonable time, agree as to punishment, the judge shall dismiss the jury and impose a sentence of imprisonment for life.

Miss. Code Ann. § 99-19-103 (1994).

(e) No person shall be eligible for parole who, on or after July 1, 1994, is charged, tried, convicted and sentenced to life imprisonment without eligibility for parole under the provisions of Section 99-19-101;

(f) No person shall be eligible for parole who is charged, tried, convicted and sentenced to life imprisonment under the provisions of Section 99-19-101; . . .

Miss. Code Ann. § 47-7-3(1)(e)-(f) (amended 1994).

> (1) An inmate shall not be eligible for the earned time allowance if:

> (a) The inmate was sentenced to life imprisonment; but an inmate, except an inmate sentenced to life imprisonment for capital murder, who has reached the age of sixty-five (65) or older and who has served at least fifteen (15) years may petition the sentencing court for conditional release; . . .

Miss. Code Ann. § 47-5-139(1)(a) (amended 1994 & 1995).

¶129. While it is true that the statute does provide for three (3) alternatives, it is also true that the earned time allowance and parole statutes effectively eliminate the possibility of parole for someone convicted of capital murder. This is an inconsistency in statutes that needs to be dealt with by the legislature. However, the question now becomes whether this inconsistency caused harmful error in the case at bar. This Court should be of the opinion that where the jury imposes the death penalty, the fact that the jury was not given the option of life with parole does not constitute harmful error. It is not logical to think that had the jury been given the option of life with parole, they might have selected that option over the death penalty. The true harmful error would arise in those cases where the trial court strictly follows the language of § 99-19-101 in capital murder cases, submits all three options to the jury, and the jury selects the option of life imprisonment. In this instance, the defense could argue that the jury was misled in that they selected the life imprisonment sentence with the assumption that the defendant may be eligible for parole, when in reality the defendant would not be eligible for parole by virtue of the parole and earned time statutes. However, since this instance is not at issue in the case at bar, we will not address this argument.

¶130. Additionally, Puckett's argument that the court wrongfully injected questions regarding parole into the statutory sentencing alternatives is without merit since that is exactly what Puckett is arguing should be done.

## XV. WHETHER THE TRIAL COURT ERRED IN DENYING DEFENDANT'S CHALLENGES TO MISSISSIPPI'S DEATH PENALTY?

¶131. Puckett's final assignment of error alleges Mississippi's death penalty statute is unconstitutional. Specifically, Puckett maintains "[t]he Mississippi death penalty constitutes cruel and unusual punishment for all of the reasons set forth by the United States Supreme Court in *Furman v. Georgia*, 408 U.S. 238, 33 L.Ed. 2d 346, 92 S.Ct. 2726 (1972)." Puckett also cites "[t]he American Bar Associations' recent call for a moratorium on the death penalty" in support of his argument.

¶132. However, as the State correctly points out, "[n]either *Furman* nor the American Bar Association is controlling or even persuasive authority." Mississippi's death penalty statutes have been reviewed and upheld as constitutional in light of *Furman* as well as later United States Supreme Court cases. *See Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed. 2d 859 (1976); *Proffit v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed. 2d 913 (1976); *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed. 2d 929 (1976); *Johnson v. State*, 476 So. 2d 1195, 1201 (Miss. 1985); *Billiot v. State*, 454 So. 2d 445, 464 (Miss. 1984); *Williams v. State*, 445 So. 2d 798, 809 (Miss. 1984); *Edward v. State*, 441 So. 2d 84, 90 (Miss. 1983); *Smith v. State*, 419 So. 2d 563, 566 (Miss. 1982); *Bullock v. State*, 391 So. 2d 601, 611 (Miss. 1980); *Coleman v. State*, 378 So. 2d 640, 647 (Miss. 1979); *Washington v. State*, 361 So. 2d 61, 66 (Miss. 1978); *Gray v. State*, 351 So. 2d 1342, 1344 (Miss. 1977); *Jackson v. State*, 337 So. 2d 1242, 1249 (Miss. 1976).

¶133. Puckett also alleges the death penalty should not be available in the case at bar, due to his age at the time of the offense. Puckett was eighteen (18) years old when he took Rhonda Griffis' life. Puckett was nineteen (19) at the time of his trial. As this Court stated in *Foster v. State*, 639 So. 2d 1263, 1296 (Miss. 1994), "[t]he capital murder statutes in this state include age as a mitigating factor to be considered by a jury." Furthermore, this Court's holding in *Blue v. State*, 674 So. 2d 1184 (Miss. 1996) is dispositive of this issue, wherein the Court stated,

> In the instant case, Blue was seventeen years old when he allegedly committed capital murder. As in *Foster*, once again we hold that although the Mississippi statutory scheme does in fact lack age specificity, there is a very strong statutory inference that the death penalty cannot be imposed on an individual who is under thirteen years of age. More importantly, no constitutional quagmires exist, because *Blue committed his crime at an age where "it is sufficiently clear that no national consensus forbids the imposition of capital punishment."* *Wilkins v. Missouri*, 492 U.S. 361, 380-81, 109 S.Ct. 2969, 2981, 106 L.Ed. 2d 306 (1989) (emphasis added); *Stanford*, 492 U.S. 361, 370-73, 109 S.Ct. 2969, 2975-77 (1989). *See also Thompson v. Oklahoma*, 487 U.S. 815, 108 S.Ct. 2687. . . .

*Blue*, 674 So. 2d at 1231. Based on this Court's previous holdings, at the age of eighteen (18), Puckett was an adult and clearly eligible for the death penalty. Accordingly, this assignment of error is without merit.

## PROPORTIONALITY REVIEW

¶134. In accordance with Miss. Code Ann. § 99-19-105(3)(c) (1994), this Court must determine whether the death sentence in this case "is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." When the sentence is disproportionate, this Court may "set the sentence aside and remand the case for modification of the sentence of life imprisonment." Miss. Code Ann. § 99-19-105(5)(b) (1994).

¶135. *Blue v. State*, 674 So. 2d 1184 (Miss. 1996), is useful for the proportionality review in this case, since the crime and the defendant are similar. The defendant in *Blue* was seventeen years old at the time of the crime, mildly mentally retarded, from a dysfunctional family, and lacking of positive role models. *Id.* at 1234. Blue's crime was capital murder committed during the course of (1) the sexual penetration of [the victim's] anus with a baseball bar, (2) the penetration of [the victim's] anus with his penis, and (3) armed robbery of [the victim's] purse and firearm. Blue was sentenced to death on the capital murder charge, and thirty years for each of the other charges. *Id.* at 1191.

¶136. Although Puckett was similar to Blue in that he was eighteen at the time of the murder, he did not produce any evidence that he was mentally impaired or impaired due to a dysfunctional family or lack of positive role models. To the contrary, Puckett produced evidence that he was a good student, gainfully employed and an Eagle Scout.

¶137. Puckett's crime was very similar to Blue's crime, although the number of wounds Puckett inflicted upon his victim was more numerous and thus more egregious. Upon review of all the circumstances involved in the case at bar, this Court finds that the death sentence is not disproportionate as applied to Puckett.

## CONCLUSION

¶138. The assignments of error presented by Puckett are without merit, except for Issue III. This case is remanded for a proper *Batson* hearing according to the mandate in *Batson* and *Hatten*.

¶139. REMANDED FOR A *BATSON* HEARING.

PRATHER, C.J., MILLS AND WALLER, JJ, CONCUR. BANKS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY SULLIVAN, P.J., AND McRAE, J. PITTMAN, P.J., NOT PARTICIPATING.

BANKS, JUSTICE, DISSENTING:

¶140. In my view, the evidence regarding the Canebrake incident was inadmissible. Accordingly, I respectfully dissent.

¶141. The majority holds that the prosecution was entitled to introduce evidence regarding the Canebrake incident because the defendant opened the door by first introducing evidence of his good character. However, the defendant can not open the door by pursuing, on cross-examination, evidence which the prosecution has previously introduced in its case in chief. *See United States v. Colon*, 880 F.2d 650, 661 (2d Cir. 1989); *Johnson v. State*, 666 So. 2d 499, 503 (Miss. 1995); *Tobias v. State*, 472 So. 2d 398, 400 (Miss. 1985) (The State can not initiate the opening of the door and then later try to impeach the defendant). Here, the fact that David had written a letter of recommendation for Puckett and the fact that David had fired Puckett, were both brought out in the State's case in chief. David, as a prosecution witness, testified on direct examination as to both the letter of recommendation and the fact that he had fired Puckett. Additionally, the main basis for the trial court holding that the door had been opened was David's answer that he "told him why he was terminated." However, this answer was not solicited by the question asked by the defense. Therefore, it is clear that the cross-examination testimony did not open the door to evidence of the defendant's bad character.

¶142. The State argues that the evidence is admissible under Miss. R. Evid. 404(b) as proof of Puckett's motive. Determining whether to admit evidence under Rule 404(b) requires a two part analysis. The evidence offered must (1) be relevant to prove a material issue other than the defendant's character; and (2) the probative value of the evidence must outweigh the prejudicial effect. *Lester v. State*, 692 So. 2d 755, 779 (Miss. 1997); *Day v. State*, 589 So. 2d 637, 641 n.1 (Miss. 1991); *Jenkins v. State*, 507 So. 2d 89, 93 (Miss. 1987) ("Rule 403 is an ultimate filter through which all otherwise admissible evidence must pass."), *modified by Heidel v. State*, 587 So. 2d 835, 845 n.8 (Miss. 1991). A previous conflict between the defendant and a third party may be relevant to prove motive "if it led up to the charged offense, involved the victim in any way, or tended to reveal the defendant's motive." *Peden v. Texas*, 917 S.W.2d 941, 951 (Tex. App. 1996). However, the fact that Puckett may have felt that he was wrongfully terminated, thereby giving him a motive to murder Rhonda, could have been brought out without giving the details of the Canebrake incident. Therefore, it is apparent that the details themselves did not increase the probability that Puckett had a motive to murder Rhonda.

¶143. Even if the evidence were relevant it is still inadmissible under a Rule 403 analysis. The second step in determining the admissibility of other acts evidence requires that the evidence "satisfy the balancing test

imposed by Rule 403 which requires the probative value of the evidence of other crimes to outweigh the harmful consequences that might flow from its admission." **Lesley v. State**, 606 So. 2d 1084, 1090 (1992) (citations omitted). The unfair prejudice associated with admitting the Canebrake evidence is substantial. Evidence is unfairly prejudicial where it tends to motivate the jury to make a decision based on inappropriate criteria, such as emotional outrage or a desire to punish for prior bad acts. *Old Chief v. United States*, 519 U.S. 172, 117 S. Ct. 644 (1997) ("capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged."). In the case *sub judice* there is a substantial possibility that the nature of the prior incident would affect the jury more than the fact that a termination resulted. The facts of the Canebrake incident held overtones of a prior sexual assault on a woman, which may have unfairly infected the factual determination in this case. Thus, the evidence of the Canebrake incident was unfairly prejudicial and should not have been admitted.

¶144. Additionally, the probative value of this prior bad acts evidence is slight, at best. The facts and circumstances of the Canebrake incident standing alone do not increase the probability that Puckett had a motive to murder Rhonda. The Canebrake incident only leads to Puckett's possible motive for murdering Rhonda when combined with the additional facts that (1) David fired Puckett; and (2) David was married to the victim. If the facts of the Canebrake incident are removed from the equation you are left with the fact that David fired Puckett and that David was married to the victim; these facts are enough to develop Puckett's motive. Relevant to that issue would be Puckett's attitude regarding the firing. The details of the allegations leading to the firing says nothing about Puckett's attitude or reaction to the firing. The only thing the Canebrake incident adds is that Puckett was accused of a prior bad act with sexual overtones, which is impermissible character evidence.

¶145. For the foregoing reasons, I would reverse and remand for a new trial. Since, in my view, the erroneous admission of testimony concerning the Canebrake incident by itself necessitates a reversal and remand for a new trial, I would not reach the remaining issues.

**SULLIVAN, P.J., AND McRAE, J., JOIN THIS OPINION.**

1. Puckett also claimed to have had a prior sexual encounter with Rhonda several months before this incident, somewhere around May 1995. However, Puckett stated that he had no further contact with Rhonda between May 1995 and the date of the murder on October 14, 1995.

2. Although Puckett also objected to the State's striking of female venire persons, this objection was not pursued on appeal since the empaneled jury was not disproportionate in terms of gender.

3. One female was of Asian decent.

4. Given the fact that the defendant is not challenging the striking of this juror, an additional reason for striking Ms. Ouimette was omitted in an attempt to protect her privacy.

5. Even though it was not mentioned during this colloquy, Grayer's questionnaire indicated that she had been arrested in 1994 for point and aim and that a family member had been a defendant in a criminal action. However, no further information regarding these matters was provided.

6. Even though it was not mentioned during this colloquy, Wesby's questionnaire indicated that he had been arrested for simple assault but no further information regarding this matter was provided.

7. The prosecution noted that there were probably 50 pictures taken right after the murder occurred which were considerable more gruesome than the ones offered. The State specifically intended to introduce photographs where the victim had been cleaned up to avoid undue prejudice.

8. Defense counsel did not make a contemporaneous objection, but after a few questions on the matter approached the bench. Defense counsel acknowledged the prosecution has wide latitude on cross-examining a defendant, but stated that the questions appeared to be delving into attorney/client privilege. The prosecutor stated that the questions went to Puckett's credibility - - that Puckett supposedly witnessed this murder but neglected to report it. The prosecution then agreed not to pursue the issue any farther, stating that he did not mean to insinuate anything on Puckett's part.

9. Although *Williams* supports the defendant's overall argument that the Court has the prerogative of relaxing the contemporaneous objection rule, it does not support his argument in regards to the issue at bar. The defendant in *Williams* requested a mistrial based upon a prosecution witness' statement that the defendant invoked his right to silence. However, because the defense counsel did not make specific objection to this statement, this Court would not consider this issue on appeal. Rather, this Court stated "[t]he specific ground or grounds for an objection must be pointed out to the lower court so that timely remedial action, if necessary and possible, can be provided." *Williams*, 445 So. 2d at 806.

10. The prosecution also sought to introduce evidence of Puckett's fondness of a Stephen King movie called "The Dark Half." However, this evidence was not allowed.

11. The letter, on Southern Landscape stationary read: "During the past two years I have had the opportunity to employ Larry Matthew Puckett. Matt is an aggressive employee and a quick learner with a very positive attitude. Along with these valuable skills he also interacts well with his co-workers as well as the customers. Matt is a morally conscious young man who will definitely have a positive influence on everyone he comes in contact with and on everything he tries to accomplish. As Matt's employer and friend I would highly recommend him for an Eagle Scout. If any further recommendations are needed please feel free to contact me at the address or phone number listed on the above letterhead." /s/ Justin David Griffis, Owner.

12. The trial judge ordered an edited version of the tape taking out any reference to the possible rape of the victim. The trial judge also gave the jury a cautionary instruction not to consider what was obviously edited out of the tape.

13. Puckett attempts to substantiate his position by pointing out that no evidence of seminal fluid was found.

14. The current version of the Sexual Battery statute prohibits sexual penetration of a child under the age of fourteen. *See* Miss. Code Ann. § 97-3-95(1)(c).

15. The trial judge inserted this language over Puckett's objection.

16. The practice of excluding witnesses was recognized by the Mississippi courts before the Mississippi Rules of Evidence became effective on January 1, 1986. However, the language of Rule 615 provided for a different practice than that previously recognized.