IRVING, J., for the Court.
¶ 1. Donna and Randy Peebles, individually and on behalf of their son, Kevin Peebles, sued Winston County, Sheriff Randy Thomas, and the Winston County Board of Supervisors (hereinafter collectively referred to as Winston County), alleging reckless disregard by Auxiliary Deputy Sheriff Paul Griffith in connection with a motor vehicle accident between himself and Kevin. The circuit court granted a directed verdict in favor of Winston County. Aggrieved, the Peebleses appeal and assert that the court erred in (1) failing to find that Griffith’s actions constituted reckless disregard, (2) failing to qualify Jonathan DeBord as an expert witness, and (3) finding that Griffith continuously had his emergency siren on prior to the accident.
¶ 2. We find no error; therefore, we affirm.
FACTS
¶ 3. On the evening of August 10, 2002, Griffith was conducting his routine patrol in the Winston County area when he received a 911 call, advising him of an accident with injuries. Griffith radioed dispatch and advised that he was proceeding to the accident scene. While en route, Griffith was informed that a Mississippi Highway Patrol officer was already at the accident scene. Griffith was never told to cease continuing to the scene. However, after learning of the presence of the highway patrol officer, Griffith testified that he continued in emergency mode to the accident scene, but at a reduced rate of speed.
¶ 4. At the same time that Griffith was proceeding to the accident scene, Kevin was traveling on the same stretch of highway, en route to meet his parents for dinner at a nearby restaurant. As Griffith topped the crest of a small hill on the highway, he came upon Kevin, driving his truck in the same lane and in the same direction as Griffith. According to Griffith, he saw Kevin’s brake lights come on and the vehicle appeared to be drifting to the right side of the lane. Apparently, Kevin could not pull off onto the shoulder because of the design of the highway at that particular location. Griffith, believing that Kevin was yielding the right of way, attempted to get around Kevin’s truck by *387 passing in the left lane. However, Kevin turned left into Griffith’s path of travel. Griffith steered toward a ditch and applied his brakes in an effort to avoid a collision. Notwithstanding his efforts, a collision took place between Griffith and Kevin.
¶ 5. Additional facts, as necessary, will be related during our discussion of the issues.
STANDARD OF REVIEW
¶ 6. “A circuit court judge sitting without a jury is accorded the same deference with regard to his findings as a chancellor, and his findings are safe on appeal where they are supported by substantial, credible, and reasonable evidence.” Maldonado v. Kelly, 768 So.2d 906, 908(¶4) (Miss.2000). His findings will not be disturbed on appeal “unless they are manifestly wrong, clearly erroneous or an erroneous legal standard was applied.” City of Jackson v. Perry, 764 So.2d 373, 376(¶ 9) (Miss.2000).
ANALYSIS AND DISCUSSION OF THE ISSUES

1. Reckless Disregard

¶ 7. In its motion for a directed verdict, Winston County asserted that it was immune from liability based on the Mississippi Tort Claims Act, specifically Mississippi Code Annotated section ll-46-9(l)(c) (Rev.2002). Section ll-46-9(l)(c) states that:
A governmental entity and its employees acting within the course and scope of their employment or duties shall not be liable for any claim ... [ajrising out of any act or omission of an employee of a governmental entity engaged in the performance or execution of duties or activities relating to police or fire protection unless the employee acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of the injury.
(emphasis added). It is uncontroverted that when the accident occurred Griffith was performing duties or activities within the meaning of the statute. Consequently, if Griffith did not act with reckless disregard for the safety and well-being of Kevin, then Winston County is immune from liability. See Lang v. Bay St. Louis/Waveland Sch. Dist., 764 So.2d 1234, 1237(¶ 11) (Miss.1999).
¶ 8. The Peebleses contend that the lower court erred in failing to find that Griffith acted with reckless disregard in connection with the accident. The Peebleses argue that Griffith acted with reckless disregard for the safety and well-being of Kevin by engaging in the following acts: (1) continuing to the accident scene in emergency mode with knowledge that a Mississippi Highway Patrol officer and an ambulance were present at the scene, (2) traveling at a speed of 70 to 75 miles per hour while en route to the accident scene, (3) passing on a double yellow line, (4) passing within the intersection of another highway, and (5) violating state laws based on the erroneous belief that there were victims trapped in the vehicle. In support of their argument, the Peebleses cite Miss. Dep’t of Pub. Safety v. Durn, 861 So.2d 990 (Miss.2003).
¶ 9. In their brief, the Peebleses do not adequately explain how Dum supports their position. The Peebleses merely state that “[tjhis Court [the Mississippi Supreme Court] approved the findings that reckless disregard of others [sic] safety existed, under the facts presented, requiring the state to be responsible pursuant to the [Mississippi Tort Claims Act].” We find that the Peebleses’s reliance on Dum is misplaced. The Dum case arose out of a motor vehicle accident between state highway patrolman Reginald Lantern and *388 Sammie Durn.[1] In support of its ruling that Lantern acted with reckless disregard for the safety and well-being of Durn, the circuit court found “that Lantern was in pursuit of a speeding vehicle, that the accident occurred in an area where there are numerous businesses, that visibility was limited due to the time of day, and that Lantern was operating his vehicle at an excessive speed.” Durn, 861 So.2d at 994(¶ 6). In upholding the circuit court’s ruling, the Mississippi Supreme Court stated that “no credible evidence showed that Lantern had his siren on when he attempted to pass Durn, and the physical evidence at the scene shows that Lantern was traveling at a high rate of speed.” Durn, 861 So.2d at 998(¶ 24).
¶ 10. The facts of this case are clearly distinguishable from Dum. Dum involved excessive speed and the failure to use a siren on the part of a state highway patrolman. Here, the trial court found that Griffith was not traveling at an excessive rate of speed; the trial judge specifically found that Griffith was traveling 55 to 60 miles per hour at the time of the accident.[2] The trial court also found that Griffith had his siren and blue lights in continuous operation.
¶ 11. We have held that “the common thread running through these cases [cases where an officer is accused of acting with reckless disregard in operating a motor vehicle] is an appreciation of the unreasonable risk of danger involved coupled with a conscious indifference to the consequences that were certain to follow.” Davis v. Latch, 873 So.2d 1059, 1062(¶ 15) (Miss.Ct.App.2004). “Our case law indicates ‘reckless disregard’ embraces willful or wanton conduct which requires knowingly and intentionally doing a thing or wrongful act.” Durn, 861 So.2d at 995(¶ 10).
¶ 12. We find an absence of conduct that would constitute reckless disregard in the present case. Griffith was dispatched to the scene of an accident that apparently involved serious injuries because two ambulances had been dispatched to render aid. After Griffith learned that a highway patrolman was already present at the accident scene, he continued to the scene with blue lights and siren in constant operation and traveling at a rate of 55 to 60 miles per hour. Griffith testified that he believed that Kevin was yielding the right of way to him because when he encountered Kevin on the highway, he saw Kevin’s brake lights come on, and he noticed the truck drifting to the right side of the lane. Moreover, when Griffith realized that Kevin was not yielding the right of way and was attempting to make a left turn, he tried to avoid an accident by applying his brakes and steering his car toward the ditch. Consequently, based on these facts, we agree with the trial judge’s conclusion that, at most, Griffith was guilty of negligence in connection with the accident. There is no indication that Griffith engaged in any “willful or wanton conduct” *389 or acted “with a conscious indifference” to the consequences of attempting to pass Kevin.
¶ 13. We find that Griffith’s actions did not rise to the level of reckless disregard for the safety and well-being of Kevin. Therefore, we find that Winston County is immune from liability. The trial judge’s grant of a directed verdict in favor of Winston County was proper.

2. Expert Witness

¶ 14. The Peebleses contend that the trial court erred by not allowing Jonathan DeBord, an accident reconstructionist, to give his expert opinion regarding the use of proper police procedures in emergency situations. At trial, the Peebleses designated DeBord as an expert in the field of accident reconstruction, and Winston County conceded that DeBord was qualified as an expert in that field. However, the Peebleses then sought to tender De-Bord as an expert in proper police procedures under the guise that his opinions regarding proper police procedures were interrelated with his opinions on accident reconstruction. The trial court refused to allow DeBord to give his expert opinion regarding proper police procedure, finding that he was no more qualified than any other law enforcement officer in the state to render an expert opinion in that area.
¶ 15. “The admission of expert testimony is within the sound discretion of the trial judge.” Miss. Transp. Comm’n v. McLemore, 863 So.2d 31, 34(¶ 4) (Miss.2003) (citing Puckett v. State, 737 So.2d 322, 342(¶ 57) (Miss.1999)). The decision of the trial judge will stand unless “that discretion was' arbitrary and clearly erroneous, amounting to an abuse of discretion.” Id.
¶ 16. We note that in refusing to allow DeBord to give his expert opinion on proper police procedures, the trial court said the following:
And I don’t see that — I mean, you’re offering him for something different than accident reconstruction if he’s — if he — he’s actually being offered, it sounds like to me, to be testifying as to proper police procedures that needs to be used in an emergency situation, I assume.... Well, I believe he’s testified that he hasn’t got anymore training in this area than anybody else. It’s just a regular law enforcement officer that— you know, in service at Meridian and then training at the police academy in Pearl. I think that he is an expert in accident reconstruction. I’m satisfied that his qualifications are such.that he can testify in that regard. And to the extent that you have questions in that area, I’ll allow those.... But as far as in the area of police procedure, I don’t think that he’s any more qualified than any other law enforcement officer that’s out there certified by the state to be a law officer.
¶ 17. Despite its ultimate ruling on the matter, the trial court afforded the Pee-bleses several opportunities to establish DeBord as an expert in the area of police procedures. The trial court stated that the Peebleses had to demonstrate that De-Bord had received additional education and training in the area of police procedures, just as he had in the area of accident reconstruction. In an attempt to establish DeBord’s qualifications in the area, the Peebleses asked DeBord if he had had “any education or training or certification in dealing with emergency driving standards.” DeBord replied, “No.” Therefore, by his own admission, DeBord established that he did not have any more training or education regarding police procedures than any other law enforcement officer in the state. DeBord also admitted that he *390 had never testified as an expert on police procedures. He further admitted that he had never testified regarding police procedures in emergency situations.
¶ 18. In short, we find that the trial court did not abuse its discretion, because DeBord was clearly not qualified to render an expert opinion in the field of proper police procedures. This issue is without merit.

3. Continuous Operation of Emergency Siren

¶ 19. The Peebleses argue that the trial court erred in finding that Griffith continuously had his emergency siren on prior to the accident. The Peebleses contend that Griffith was cycling his siren off and on, and that his siren was off prior to the accident and was turned on just immediately before the collision. The Peebleses point to the testimony of Perry Clay, Rodney Stokes, Laura Thornton, Larry Gregory, and Griffith as support for their argument.[3] However, a fair and balanced reading of the entire testimony of each witness reveals a lack of support for the Peebleses’s contentions.
1120. Laura Thornton, a waitress at Goodin’s Grocery Store, was working at the time of the accident.[4] On direct examination, she testified that she heard a siren immediately before she heard the impact. Thornton testified on cross-examination that she did not know whether the siren had been on for some time as Griffith approached the accident scene.
¶ 21. Perry Clay, a cook at Goodin’s Grocery Store, testified on direct that he heard a short, brief siren immediately before he heard a booming sound (the sound was the collision of the vehicles). On cross-examination, Clay was questioned about whether he had told an investigator for Winston County that he had heard the siren for some time before he heard the collision. In response, Clay testified that he could not deny that he had said that because he could not remember. Essentially, Clay testified that, due to the length of time between the accident and the trial, he basically could not remember much of anything about the accident or what he had previously told people about the accident.
¶ 22. Rodney Stokes, a customer at Goodin’s Grocery Store when the accident occurred, testified that he heard the impact of the accident. Stokes stated that he “heard a siren and then a loud noise.” Stokes further testified that he could not recall hearing the siren coming down the road. However, on cross-examination, Stokes admitted that he could not say with certainty that the siren was not on before he had heard it.
¶23. Larry Gregory testified that he lived 400 or 500 yards from Goodin’s Grocery Store. Gregory testified that there was no doubt in his mind that he heard the siren as Griffith was approaching his house. However, Gregory testified that it sounded as if Griffith had turned his siren off after he passed his house and proceeded down the road. On cross-examination, Gregory testified that, “[i]t just sounded like he turned it [the siren] off. Now, as far as I know, whether it [the siren] was still on or not, I cannot say.” Gregory also admitted on cross-examination that he had a hearing problem and that he was not wearing his hearing aid on the day of the accident.
*391 ¶ 24. Griffith testified that his siren and blue lights were in continuous operation from when he first began to proceed to the accident scene until the collision occurred.
¶ 25. We are mindful of the fact that there was conflicting testimony pertaining to the siren. Nevertheless, every witness, besides Gregory, testified that the siren was on at the time of impact. Furthermore, the trial judge heard all the testimony, gauged the credibility of the witnesses, and found that Griffith’s siren was in continuous use. More specifically, the trial judge stated the following:
The witness, David Lee Gregory, testified that he lives 400 to 500 yards from Goodin’s Grocery, which is the scene of the accident. He testified that he heard the siren coming from towards Louisville. That he could not hear that siren once he — it passed — -the automobile passed his house, and he could not testify whether the siren was cut off once it passed his house or whether he just could not hear it, and he did testify that he did have hearing problems. Perry Clay, James Rodney Stokes and Laura Thornton all heard the siren just before the accident. This Court — using the calculations and assuming that Deputy Griffith was traveling at a rate of 60 miles per hour, calculated that it would just take 19.8 seconds from the front of Mr. Gregory’s house to the front of Goo-din’s Grocery, the car would have traveled that distance in that amount of time. The Court, therefore, finds that the siren was on the entire time. The Court finds it unbelievable and inconsistent and inconceivable that the siren could be on, then off, then on again in that short period of time. And Deputy Griffith certainly did not testify to that fact and no one else has as well.
¶ 26. Our supreme court has stated that “[o]n appeal of a trial court judgment rendered subsequent to a bench trial where the judge has sat as the fact-finder, we afford deference to the findings of the trial judge.” Chantey Music Pub., Inc. v. Mataco, Inc., 915 So.2d 1052, 1055(¶ 10) (Miss.2005). With that standard in mind, we decline to disturb the trial judge’s finding that Griffith’s siren was in continuous operation.
¶ 27. THE JUDGMENT OF THE CIRCUIT COURT OF WINSTON COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
KING, C.J., LEE AND MYERS, P.JJ., SOUTHWICK, CHANDLER, GRIFFIS, BARNES, ISHEE AND ROBERTS, JJ., CONCUR.

. After passing Dum, Lantern observed a speeding vehicle. Lantern made a u-turn, activated his blue lights, and began pursuit of the speeding vehicle. During the pursuit, an accident between Durn and Lantern occurred as Durn attempted to make a left hand turn into a garage parking lot. Dum, 861 So.2d at 993 (¶¶ 2-5).

. From the credible testimony, the trial judge found that Griffith, at best, was exceeding the speed limit by just five miles per hour when the accident occurred. The trial judge also noted that Mississippi Code Annotated section 63-3-517 (Rev.2004) allowed Griffith to exceed the speed limit under the circumstances. Section 63-5-517 states in pertinent part: "[tjhe speed limitations set forth in this article shall not apply to authorized emergency vehicles when responding to emergency calls and the drivers thereof sound audible signal by bell, siren, or exhaust whistle.”

. We note that, besides Griffith, none of the other witnesses actually saw the accident.

. Goodin’s Grocery Store was the restaurant where Kevin was scheduled to meet his parents for dinner on the evening of the accident.